**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 15 1997**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

    No. 97-6028

CLYDE WAYNE MELTON,

    Defendant-Appellant.

---

Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. CR-96-86-A)

---

**On the briefs:**

O. Ronald McGee, of O.Ronald McGee & Associates, P.C., Ponca City,
Oklahoma and Kenneth E. Holmes and James A. Schaffer, of Holmes & Schaffer,
Ponca City, Oklahoma, for Defendant-Appellant.

Patrick M. Ryan, United States Attorney and Teresa Black, Assistant U.S.
Attorney, Oklahoma City, Oklahoma, for Plaintiff-Appellee.

---

Before **SEYMOUR**, Chief Judge, **PORFILIO** and **MURPHY**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

Clyde Wayne Melton pled guilty to one count of conspiracy to violate federal counterfeiting statutes and was sentenced to twenty-seven months in prison. On appeal, he contends the district court improperly enhanced his sentence on the basis of coconspirators' conduct. We agree, vacate his sentence, and remand for resentencing.[1]

## I

The record of Mr. Melton's plea proceeding and sentencing reveals the following undisputed facts. On April 3, 1996, John Delaney, a convicted counterfeiter, met with Ronnie Sims and Keene Edenfield in Amarillo, Texas, to discuss a plan to print counterfeit Federal Reserve notes in Oklahoma City. Mr. Sims agreed to finance the operation and Mr. Edenfield agreed to distribute the counterfeit money. Mr. Edenfield was a confidential government informant and notified the Secret Service. Mr. Delaney was put under surveillance, and was observed making preparations to set up the printing equipment.

Mr. Delaney recruited Mr. Melton, who agreed to help locate a suitable building and to loan Mr. Delaney a truck and an employee to help move

---

[1]After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The cause is therefore ordered submitted without oral argument.

equipment. Agents observed Mr. Delaney and Mr. Melton's employees transporting printing equipment to Mr. Delaney's apartment. Mr. Melton found a building and the equipment was to be moved into it on May 2, 1996. On May 1 federal agents arrested Mr. Melton and Mr. Delaney after they were observed removing tracking devices which the agents had placed on their vehicles.

After his arrest, Mr. Delaney worked actively with the Secret Service to set up a reverse sting operation in order to further investigate Mr. Sims, the Texas investor. Pursuant to this operation, the government provided a building, bought the supplies, and secured a press. The operation ultimately printed over $30 million in counterfeit money, none of which was distributed. Mr. Melton did not participate in any of this activity. The government admits that Mr. Melton never had any contact with either Mr. Sims or Mr. Edenfield, and that he had no part in deciding the amount to be printed during the sting operation.

The presentence report recommended a sixteen-level increase in Mr. Melton's base offense level based on the $30 million in counterfeit bills printed by the sting operation after his arrest. Mr. Melton objected to the enhancement, arguing that his role in the conspiracy ended when he was arrested on May 1, and that he should not be held accountable at sentencing for the amount of money printed by Mr. Delaney pursuant to the sting.

The government originally agreed with Mr. Melton. Counsel for the government stated at the sentencing hearing that "[f]or all practical purposes, on May One, when Mr. Melton was arrested, his involvement stopped with this entire situation." Aplt. App. at 27. Counsel further stated:

> There's some confusion as to exactly who said the 30 million or what, but all of this was, I think, arrived at after Mr. Melton had ceased to be involved with Mr. Delaney. And of course, he had no involvement with Sims, the financier of it, nor with the other informant . . . , who's in Texas. . . . And I would submit that Mr. Melton didn't really have anything, no control over it, how they arrived at the 30 million, or the supplies or renting of the place. And I say quite candidly that the government supplied the place to carry out the sting operation . . . , bought the supplies, secured the press.

Id. at 28. Nonetheless, the district court overruled Mr. Melton's objection and found that the production of the $30 million in counterfeit funds was part of the conspiracy and that the printing of a large amount was reasonably foreseeable even though Mr. Melton did not participate in determining the amount.

## II

We review the sentencing court's application of the guidelines de novo and its fact findings under the clearly erroneous standard. United States v. Morales, 108 F.3d 1213, 1225 (10th Cir. 1997). The government bears the burden of proving by a preponderance of the evidence that the conduct of coconspirators is to be attributed to the defendant for sentencing purposes. Id. at 1226.

-4-

Under the guideline applicable to the offense of conspiracy, the base offense level is determined by the guideline for the substantive offense plus the adjustments for that guideline which "can be established with reasonable certainty." USSG § 2X1.1(a). The base offense level for counterfeiting violations is nine. Id. § 2B5.1(a). The guideline further provides that if the face value of the counterfeit items is over $2,000, the offense level is increased by reference to the table applicable to fraud offenses in USSG § 2F1.1. That table, in turn, provides that offenses involving $30 million are enhanced sixteen levels. See USSG § 2F1.1(b)(1)(Q).

In addition, because Mr. Melton was convicted of conspiracy, the relevant conduct for sentencing purposes is to be determined by USSG § 1B1.3(a)(1)(B), applicable to jointly undertaken criminal activity. Under that guideline, Mr. Melton's sentence is to be calculated on the basis of "all reasonably foreseeable acts and omissions of others *in furtherance of the jointly undertaken criminal activity*, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." Id. (emphasis added). The commentary to this guideline provides the following guidance in its application.

> The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability. Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be

held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a . . . conspirator.

USSG § 1B1.3, comment. (n.1). The commentary further states that

> the scope of the criminal activity jointly undertaken by the defendant (the "jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement).

Id. comment. (n.2).

In response to Mr. Melton's objection to the sixteen-point enhancement recommended by the presentence report and the government's comments on the matter, the court stated at the sentencing hearing

> the Probation Office's position is essentially that "in for a penny, in for a pound;" and as a co-conspirator, an offense for which Mr. Melton has entered a plea of guilty, he is responsible for the foreseeable consequences of the acts of his coconspirators. I'm not aware of any principle that that liability ends so long as the conspiracy is set in motion. It doesn't come to an end merely because extrinsic events like an arrest interrupt a particular conspirator's participation. . . . So the objection is overruled with respect to the 30 million dollars, and I find that the production of that amount was a foreseeable consequence of a conspiracy. No particular dollar amount would be foreseeable to Mr. Melton, but it is foreseeable that there would be production of counterfeit money in large amounts, that's the very purpose of the conspiracy, and it is relevant conduct connected to Mr. Melton because it is a foreseeable consequence of the corrupt agreement.

Aplee. Supp. App. at 24, 28-29.

Although the court's statement is somewhat unclear, it reveals two possible grounds for the court's conclusion that the sixteen-level enhancement was appropriate. First, the court apparently believed that the scope of Mr. Melton's participation in the conspiracy extended beyond the date of his arrest and that he was therefore accountable for the final product of the entire conspiracy, i.e., $30 million in counterfeit bills produced by the reverse sting operation.[2] Second, even if the scope of the criminal activity Mr. Melton agreed to jointly undertake did not include events subsequent to his arrest, the court might have concluded it was reasonably foreseeable to Mr. Melton that $30 million of currency would be produced in the original counterfeiting scheme.[3]

As the commentary quoted above makes clear, "the court must first determine . . . the scope of the specific conduct and objectives embraced by the defendant's agreement." USSG § 1B1.3, comment. (n.2). In making this determination, the court must keep in mind that "the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy." Id.; see also United States v. Williams, No. 91-2183, 1992 WL 129615, at *2-*3 (10th Cir. June 11, 1992) (incorrect application of

---

[2] The "in for a penny; in for a pound" rationale.

[3] The "reasonably foreseeable" rationale.

guidelines where district court "made no distinction between the scope of [defendant's] agreement and that of his coconspirators").[4]  Proper attribution at sentencing requires the district court to analyze, and make "particularized findings" about, the scope of the specific agreement the individual defendant joined in relation to the conspiracy as a whole.  See United States v. Thomas, 114 F.3d 228, 255 (D.C. Cir. 1997); United States v. Childress, 58 F.3d 693, 722-23 (D.C. Cir. 1995), cert. denied, 116 S. Ct. 825 (1996).

The district court failed to make such "particularized findings" and misapplied the sentencing guidelines by improperly assuming that the scope of the criminal activity Mr. Melton agreed to jointly undertake was the same as the scope of the entire conspiracy, including the reverse sting.  We need not remand for further proceedings on the scope of Mr. Melton's particular agreement, however, because the facts underlying the determination are undisputed and do not carry the government's burden of establishing Mr. Melton's accountability for the activity that took place after he was arrested.[5]  Mr. Melton agreed to aid the

---

[4] In accordance with 10th Cir. R. 36.3, we find this unpublished opinion persuasive.

[5] Indeed, at the sentencing hearing, when the court specifically asked the government to bear its burden of proof and present facts in support of an adjustment upward based on the $30 million produced in the reverse sting operation, the government admitted it could not meet this burden.  The only facts it could present to the court were "actually what occurred:" "on May One, when Mr. Melton was arrested, his involvement stopped with this entire situation," and

(continued...)

-8-

original scheme by providing a truck to help move equipment obtained by Mr. Delaney and by finding a building for that equipment. After he and Mr. Delaney were arrested, the original agreement was abandoned and was replaced by a reverse sting operation which was set up, funded, and equipped by the government in order to investigate a coconspirator Mr. Melton had never met through activity to which Mr. Melton never agreed. Mr. Melton was indicted only for activities that took place from March 1, 1996 to May 1, 1996, the date of his arrest. He was not indicted for the events of the reverse sting operation. We have found no indication in the record that the post-arrest metamorphosis of the original counterfeiting plan was within the scope of the criminal activity Mr. Melton agreed to undertake. A defendant should not be held accountable when coconspirators substantially alter the agreed-upon plan without his knowledge or acquiescence. United States v. Gonzales, 65 F.3d 814, 822-23 (10th Cir. 1995), vacated on other grounds, 117 S. Ct. 1032 (1997).

Insofar as the district court's upward enhancement of Mr. Melton's sentence relied on the $30 million produced subsequent to his arrest, the court's observation that the printing of a large amount of money was reasonably foreseeable simply does not inform the issue of the scope of Mr. Melton's

_____

[5](...continued)
"the conspiracy . . . was over at that point with [regard to] him." Aplt. App. at 27.

-9-

agreement. "[R]easonable foreseeability is not by itself sufficient to establish liability for the acts of coconspirators. To be considered as relevant conduct, such acts also must be in furtherance of 'jointly undertaken criminal activity.'" United States v. McDuffy, 90 F.3d 233, 236 (7th Cir. 1996); Childress, 58 F.3d at 723 ("[W]ith respect to scope of the agreement analysis, . . . court 'was actively employing the wrong legal standard' by focusing exclusively on reasonable foreseeability.") (citation omitted).

Furthermore, although the district court was correct in noting that a conspiracy does not end simply because one conspirator has been arrested, the court failed to address the more relevant and narrow issue of whether the arrest of a conspirator signals the end of that particular conspirator's role in the ongoing conspiracy. Although a conspirator's arrest or incarceration by itself is insufficient to constitute his withdrawal from the conspiracy, see United States v. Nelson, No. 90-3081, 1991 WL 163061, at *12 (10th Cir. Aug. 23, 1991), an arrest may under certain circumstances amount to a withdrawal. Compare United States v. Harris, 542 F.2d 1283, 1299, 1301 (7th Cir. 1976) (no withdrawal where arrested conspirator continued to give orders concerning conspiracy from jail); United States v. Agueci, 310 F.2d 817, 839 (2d Cir. 1962) (no withdrawal where arrested conspirator designated others to look after his interest in conspiracy and continued to have stake in venture) with United States v. Brown, No. 96-3371,

-10-

1997 WL 589180, at *1 (10th Cir. Sept. 24, 1997) (arrest plus agreement to cooperate with law enforcement officials constituted withdrawal);[6] United States v. Urrego, 853 F. Supp. 646, 649-50 (E.D.N.Y. 1994) (arrest plus no evidence of continued involvement in conspiracy amounted to withdrawal); United States v. Escobar, 842 F. Supp. 1519, 1528 (E.D.N.Y. 1994) (involvement in conspiracy terminated with arrest where continued participation in conspiracy impossible). See also United States v. Price, 13 F.3d 711, 732 (3d Cir. 1994) (although arrest does not automatically bar attribution to defendant of coconspirators' acts after that date, "since '[t]he relevant conduct provision limits accomplice attribution to conduct committed in furtherance of the activity the defendant agreed to undertake,' a defendant cannot be held responsible for conduct committed after he or she could no longer assist or monitor his or her coconspirators.") (quoting United States v. Collado, 975 F.2d 985, 997 (3d Cir. 1992)).  Here, the government clearly conceded that Mr. Melton's participation in the conspiracy terminated with his arrest and that Mr. Melton had absolutely no involvement with the reverse sting operation which was entirely set up and funded by the government with the cooperation of Mr. Delaney.  Aplt. App. at 27-28.  The acts of Mr. Melton's fellow conspirators therefore cannot be attributed to him following his arrest.

---

[6] See n.4 supra.

Having concluded that Mr. Melton's role in the conspiracy ended with his arrest, we now turn to whether it was reasonably foreseeable to Mr. Melton when he participated in the original scheme that Mr. Sims and Mr. Delaney would agree to counterfeit a sum of $30 million. The district court must also make "particularized findings" as to the reasonable foreseeability of the amount of money attributed to the individual defendant. Thomas, 114 F.3d at 255. Accordingly, the district court must

> do more than state in "conclusory" terms that the quantity of [money] attributed was reasonably foreseeable to the defendant. Rather, the judge must "set[] forth the reasons why the particular amount of [money] was reasonably foreseeable to him, with reference to the evidence before the court."

Childress, 58 F.3d at 723 (quoting United States v. Edwards, 945 F.2d 1387, 1399 (7th Cir. 1991)). At the sentencing hearing, the district court explicitly stated that "[n]o particular dollar amount would be foreseeable to Mr. Melton, but it is foreseeable that there would be production of counterfeit money in large amounts." Aplee. Supp. App. at 28. While reasonable estimates based on "the available information" will suffice in determining the attributable amount of money under U.S.S.G. § 2F1.1(b), see U.S.S.G. § 2F1.1 comment. (n.8); United States v. Copus, 110 F.3d 1529, 1535 (10th Cir. 1997), we hold it was clear error for the court to arbitrarily assign $30 million as the "large amount[]" of

-12-

counterfeit money foreseeable to Mr. Melton absent any factual support for this particular amount in the record.

Even if the district court based its finding of reasonable foreseeability on conversations between Mr. Sims and Mr. Delaney that $30 million was the amount of the original counterfeiting scheme, Aplt. App. at 4, the court's determination was nonetheless clearly erroneous. Courts must examine a conspirator's position within a conspiracy and whether that position gave him firsthand knowledge of the quantity of counterfeit money involved to determine whether the conduct of other conspirators is reasonably foreseeable to him. See, e.g., Thomas, 114 F.3d at 257. If, for instance, Mr. Melton was not aware of the amount of counterfeit money that Mr. Sims and Mr. Delaney agreed to produce, the district court cannot permissibly conclude that the sum of $30 million was reasonably foreseeable to Mr. Melton and enhance his sentence based on this amount. Cf. United States v. Pretty, 98 F.3d 1213, 1222 (10th Cir. 1996) (amount of money received by coconspirator in bribery conspiracy was reasonably foreseeable and therefore properly attributed to defendants where the "nature of the conspiracy was such that each participant almost certainly knew how much money was going where"), cert. denied, 117 S. Ct. 2436 (1997); United States v. Chalarca, 95 F.3d 239, 245-46 (2d Cir. 1996) (upholding district court's imposition of sentence based upon least amount of cocaine in Sentencing

-13-

Guidelines Drug Quantity Table where record revealed defendant lacked knowledge of "how much cocaine was the subject of the conspiratorial agreement").

The district court did not make particularized findings as to the reasonable foreseeability of the amount attributed to Mr. Melton. Nor is there anything in this record that indicates Mr. Delaney ever discussed with Mr. Melton the amount originally agreed upon by Mr. Delaney and Mr. Sims, even though Mr. Delaney provided much information about the conspiracy by cooperating with the government. Indeed, the government concedes in its brief there is no evidence Mr. Melton knew of the $30 million sum agreed to by the other conspirators. Aplee. Br. at 12. Mr. Melton's lack of knowledge about the amount to be counterfeited is further supported by the fact that he played a minimal role in the conspiracy, as the district court held, and had no direct dealings with either Mr. Sims, the financier, or Mr. Edenfield, the informant. Significantly, the record reflects that Mr. Delaney misled Mr. Melton about the amount Mr. Delaney was to receive from Mr. Sims. Mr. Delaney said he was receiving $150,000 for his part in the scheme and that Mr. Melton would receive $50,000 of this amount for assisting Mr. Delaney. Mr. Delaney, however, was actually to receive $3 million. Aplee. Supp. App. at 20. Thus, the only evidence in the record concerning Mr.

Melton's knowledge is that he was being misinformed by Mr. Delaney about the scope of the counterfeiting scheme.

Accordingly, we conclude the district court misapplied the guidelines by equating the scope of the criminal activity Mr. Melton agreed to undertake with the scope of the entire conspiracy. The record contains no evidence that Mr. Melton agreed to the criminal activity undertaken after his arrest, or that it was reasonably foreseeable to Mr. Melton the amount of $30 million was the object of the original counterfeiting scheme. We therefore **VACATE** the sentence and **REMAND** for resentencing in light of this opinion.