**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 9 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

vs.

RONNIE SIMS,

     Defendant-Appellant.

No. 97-6305
(D.C. No. CR-96-111-A)
(W.D. Ok.)

**ORDER AND JUDGMENT**[*]

Before **PORFILIO**, **KELLY**, and **BRISCOE**, Circuit Judges.

Defendant-appellant Ronnie Sims was convicted by a jury of one count of

conspiracy to violate counterfeiting laws, 18 U.S.C. §§ 371, 471, 472 & 474, and

was sentenced to sixty months imprisonment, three years supervised release, and a

$10,000 fine. On appeal, Mr. Sims challenges the sufficiency of the evidence

underlying his conviction and argues the district court improperly calculated his

sentence based on an intended loss of $30 million pursuant to USSG §§ 2B5.1 and

2F1.1. Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

affirm Mr. Sims's conviction, but remand to the district court to vacate Mr. Sims's sentence and resentence him.

## Background

In early 1996, Mr. Sims and John Delaney, a printer by trade and convicted counterfeiter, discussed opening a counterfeit printing operation, but concluded that without a buyer who could help them move large amounts of currency the plan was too risky. Shortly thereafter, Keen Edenfield, an acquaintance of both Mr. Sims and Mr. Delaney and a DEA informant, contacted Mr. Sims and offered to provide an international buyer for the counterfeit currency. Mr. Edenfield, Mr. Sims, and Mr. Delaney met in Amarillo on April 3, 1996 to discuss the counterfeiting operation, agreeing that Mr. Sims would finance the operation, Mr. Delaney would print the counterfeit currency, and Mr. Edenfield would provide a buyer. On April 27, 1996 Mr. Delaney met with Mr. Edenfield and Juan, a Secret Service agent posing as Mr. Edenfield's Colombian buyer, and provided them with counterfeit negatives of a $100 bill. Mr. Delaney was arrested on May 1, 1996, and agreed to help the Secret Service "sting" Mr. Sims. Mr. Sims was arrested on June 18, 1996 at the Oklahoma City print shop after Secret Service agents witnessed him cut a few sheets of the $30 million in counterfeit currency that Mr. Delaney and the Secret Service had produced in May and early June.

## Discussion

### A. Sufficiency of the Evidence

The parties agree that Mr. Sims' conspiracy conviction must rest on evidence that on or before May 1, 1996 Mr. Sims and Mr. Delaney conspired to make, possess, or receive counterfeit bills. See Aplt. Brief at 14; Aplee. Brief at 13. To support a conviction under 18 U.S.C. § 371, the government must establish that (1) two or more persons (including the defendant) agreed to violate the law, (2) the defendant knew the essential objects of the conspiracy, (3) the defendant knowingly and voluntarily became a part of it, and (4) the alleged co-conspirators were interdependent. See United States v. Arutunoff, 1 F.3d 1112, 1116 (10th Cir.), cert. denied, 510 U.S. 1017 (1993). Mr. Sims does not deny that he agreed with Mr. Delaney to finance a counterfeiting operation. He argues instead that prior to May 1, 1996, Mr. Delaney did not intend to print and distribute counterfeit money with Mr. Sims. In other words, Mr. Sims argues, "I conspired but my co-conspirator didn't." Aplee. Brief at 11.

Reviewing de novo the evidence and the reasonable inferences therefrom in the light most favorable to the government, however, we believe a reasonable jury could find beyond a reasonable doubt that Mr. Sims and Mr. Delaney conspired to produce and distribute counterfeit hundred dollar bills prior to May 1, 1996. See United States v. Ivy, 83 F.3d 1266, 1284-87 (10th Cir.), cert. denied, 117 S. Ct.

3

253 (1996). Mr. Delaney admitted in a May 1, 1996 statement to the Secret Service, and testified at trial, that on April 3, 1996 he "agreed . . . to print thirty million dollars in counterfeit U.S. dollars" and Mr. Sims "was to provide the genuine money to finance the operation." Aplee. Supp. App. at 5; see also II Aplt. App. at 241-43. Mr. Delaney also testified that prior to May 1, 1996 he solicited $28,000 from Mr. Sims to finance the operation, received $25,000, and spent approximately $20,000 to procure printing equipment. See I Aplt. App. at 188, 193-94, 198; II Aplt. App. at 251-256. He used the camera he purchased with Mr. Sims's money to produce the $100 bill negatives he showed to "Juan" and Mr. Edenfield on April 27, 1996. See II Aplt App. at 241-43, 251. And, with the help of Clyde Melton, prior to May 1, 1996 Mr. Delaney tried to find an appropriate location for the counterfeit operation. See I Aplt. App. at 190-91.

Notwithstanding Mr. Delaney's testimony that he merely intended to defraud Mr. Sims, which the jury need not believe, the evidence tended to show that prior to May 1, 1996 Mr. Delaney and Mr. Sims explicitly agreed to produce counterfeit currency. It also showed that Mr. Sims financed the operation and Mr. Delaney actively furthered the purpose of the conspiracy prior to May 1, 1996 by purchasing equipment, searching for a suitable print shop, and producing counterfeit negatives, albeit of poor quality. See United States v. Rodriguez, 989 F.2d 583, 585 (2d Cir. 1993). Sufficient evidence supports the conviction.

## B. Sentencing

Mr. Sims also challenges the district court's sixteen-level upward adjustment of his base offense level pursuant to USSG §2F1.1 based on a calculated loss of $30 million, the amount of counterfeit currency printed in the sting operation. Mr. Sims argues (1) the district court should have granted a downward departure because the government engaged in outrageous conduct by conducting the sting operation with intent to manipulate his sentence and (2) the district court's upward adjustment was improper because the government's control over the sting operation made it impossible for any actual or intended loss to occur. We review the district court's factual determinations for clear error, and examine the district court's legal conclusions, including the factors the district court may consider in determining loss under the Sentencing Guidelines, de novo. See United States v. Galbraith, 20 F.3d 1054, 1058 (10th Cir.), cert. denied, 513 U.S. 889 (1994).

Though this Circuit has recognized that "sufficiently egregious government conduct may affect [a] sentencing determination," United States v. Lacey, 86 F.3d 956, 963 (10th Cir.), cert. denied, 117 S. Ct. 331 (1996), a downward departure based on outrageous government conduct may be granted "only [in] the most egregious circumstances," United States v. Mosely, 965 F.2d 906, 914 (10th Cir. 1992); Lacey, 86 F.3d at 966. In examining Mr. Sims's claim of outrageous

conduct, we evaluate the government's conduct in light of legitimate investigative purposes and the need for undercover government involvement. See Lacey, 86 F.3d at 964. Though Mr. Sims asserts that favorable press coverage motivated the Secret Service to print $30 million with the help of Mr. Delaney and thereby manipulate his sentence upward, the record reflects Mr. Sims ratified the sum of $30 million, whether or not suggested by a government agent. See United States v. Sivils, 960 F.2d 587, 598-99 (6th Cir.), cert. denied, 506 U.S. 843 (1992). In fact, he suggested printing up to $50 million in counterfeit currency. See Aplee. Supp. App. at 2-4. Mr. Sims thus cannot argue he was not predisposed to involve himself in a large scale counterfeiting operation, even were our analysis to turn on such a distinction. See Lacey, 86 F.3d at 963 n.5; but see Unites States v. Staufer, 38 F.3d 1103, 1106-08 (9th Cir. 1994). Moreover, prior to Mr. Sims's visit to the Oklahoma City print shop, the government had no clear evidence that Mr. Sims knew he was investing in a large scale counterfeiting operation; its continued reverse sting operation provided unequivocal evidence of Mr. Sims's knowledge of and participation in the conspiracy. We refuse to "prescrib[e] the point at which the government must cease its investigation and arrest targeted criminals," Lacey, 86 F.3d at 966, and see no reason to disturb the district court's refusal to depart downward on the basis of outrageous government conduct.

We believe, however, that the district court improperly assessed the

intended or probable loss of the offense at $30 million pursuant to USSG

§ 2F1.1.[1]  See II Aplt. App. at 471.  This court has consistently recognized that

for purposes of assessing intended loss under USSG § 2F1.1, valuations or

estimates of loss must be bounded by reality.  See, e.g., United States v.

Galbraith, 20 F.3d 1054, 1059 (10th Cir. 1994); United States v. Santiago, 977

F.2d 517, 525 (10th Cir. 1992). "[T]he loss defendant subjectively intended to

cause is not controlling if he was incapable of inflicting that loss." Galbraith, 20

F.3d at 1059.

The record indicates that the government knew of the conspiracy as early as

March 1996, see, e.g., I Aplt. App. at 87-90, and monitored its progress from that

---

[1]  The concurrence and dissent asserts we improperly incorporate the concept of loss from USSG § 2F1.1 for purposes of calculating Mr. Sims's sentence under USSG § 2B5.1.    See Concurrence and Dissent at 2-3.  According to the dissent, "only the table, and not the entire guideline, can be relied upon in determining the applicable increase in the offense level directed by § 2B5.1(b)(1)."   Id. at 3.  The table referred to in § 2F1.1(b)(1), however, itself incorporates the concept of loss,    and Application Note 7 provides guidance in interpreting the subsection of USSG § 2F1.1 to which USSG § 2B5.1(b)(1) refers. We should not ignore this guidance.    See USSG §§ 1B1.7, 2F1.1(b)(1); United States v. Lamere   , 980 F.2d 506, 511-12 (8th Cir. 1992) (relying on Application Note 7 in determining the proper offense level pursuant to USSG §§ 2B5.1 and 2F1.1);   see also  United States v. Melton   , 131 F.3d 1400, 1406 (10th Cir. 1997) (relying on USSG § 2F1.1 comment. (n.8) in determining amount of counterfeit attributable to defendant under USSG § 2F1.1(b));        United States v. Delaney , 1991 WL 85198 (10th Cir. May 20, 1991) (incorporating concept of intended or probable loss from USSG § 2F1.1 comment. (n.7) in applying USSG § 2F1.1(b)(1)(K) where defendant produced $2,000,000 in counterfeit currency but distributed only $7,380.).

time until May 1, 1996 with the use of undercover agents, informants, and audio surveillance. See, e.g., I Aplt. App. at 86-95, 99-102; II Aplt. App. at 308-18, 328-32, 377. After Mr. Delaney was arrested and his cooperation in producing the counterfeit currency was secured on May 1, 1996, the government not only provided most of the means by which the counterfeit currency was produced, see I Aplt. App. at 126; II Aplt. App. at 275, 366-68, 388-92, but also surveilled the operation continuously from that time until Mr. Sims's arrest on June 18, 1996. See, e.g, I Aplt. App. at 103-05, 107-09, 118-22, 125-26, 133-35, 142-44, 163-64, 174-76; II Aplt. App. at 283-84, 350-57, 374-76, 407-08. The government argues Mr. Sims could have inflicted the loss had a non-cooperating co-conspirator become involved prior to the government's involvement. See Aplee. Brief at 43. However, the government's investigation of Mr. Sims and Mr. Delaney began long before Mr. Delaney, with the government's assistance, actually printed the counterfeit currency. Though the investigation of the conspiracy may not have been "a sting from start to finish," Aple. Brief at 42, the record clearly indicates that at all times after the conspiracy's inception until Mr. Sims's arrest on June 18, 1996, the government either closely monitored the co-conspirators' activities or actively controlled the production of the counterfeit bills. Though Mr. Sims may have subjectively intended to incur a loss of $30 million, he was, in a very real sense, incapable of doing so due to government control and intervention. See

8

Galbraith, 20 F.3d at 1059.  We conclude the intended or probable loss was zero; there being no other intended loss or actual loss alleged, we REMAND to the district court to vacate Mr. Sims's sentence and resentence in accordance with this order and judgment.  We AFFIRM Mr. Sims' conviction.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge

9

No. 97-6305, United States v. Sims

Briscoe, Circuit Judge, concurring and dissenting:

I concur in part and dissent in part. I agree with the majority that the evidence presented at trial was sufficient to support Sims' conviction and that the district court did not err in refusing to depart downward on the basis of outrageous government conduct. However, I disagree that the district court erred in calculating Sims' offense level. I would affirm Sims' sentence, as well as his conviction.

Under the Sentencing Guidelines, "Offenses Involving Counterfeit Bearer Obligations of the United States" are governed by U.S.S.G. § 2B5.1. See, e.g., United States v. Melton, 131 F.3d 1400, 1403 (10th Cir. 1997); United States v. Gaither, 1 F.3d 1040, 1041 (10th Cir. 1993); United States v. Bruning, 914 F.2d 212, 212-13 (10th Cir. 1990). Subsection (a) of § 2B5.1 establishes a base offense level of nine. "If the face value of the counterfeit items exceed[s] $2,000," the offense level is increased "by the corresponding number of levels from the *table* at § 2F1.1 (Fraud and Deceit)." [1] U.S.S.G. § 2B5.1(b)(1) (emphasis added).

Here, the district court correctly followed the guidelines by imposing a base offense level of nine and then adding sixteen levels pursuant to the table at

_____

[1] The table at § 2F1.1 lists various dollar amounts and corresponding offense level increases ( e.g., for amounts "[m]ore than $20,000,000," the sentencing court is directed to "add 16" to the offense level).

§ 2F1.1 based on its finding that the face value of the counterfeit currency seized by the government was $30,000,000. [2] See U.S.S.G. §§ 2B5.1(b)(1), 2F1.1(b)(1)(Q).

In rejecting these calculations, the majority concludes the district court "improperly assessed the intended or probable loss of the offense." Majority Order at 7. Unfortunately, this conclusion is based on a misinterpretation of the plain language of § 2B5.1(b)(1). Rather than simply referencing "the table at § 2F1.1," the majority references the entire guideline and accompanying commentary as well, including § 2F1.1's concept of loss. Accordingly, the majority transforms what is intended to be a straightforward calculation based solely on the face value of the counterfeit currency into a determination of intended or probable loss.

Section 1B1.5 of the Sentencing Guidelines speaks directly to this issue. Although "[a] cross reference (an instruction to apply another offense guideline) refers to the entire offense guideline," U.S.S.G. § 1B1.5(a), "[a]n instruction to use a particular . . . table from another offense guideline refers only to the particular . . . table referenced, and not to the entire offense guideline." U.S.S.G.

---

[2] Although Sims was convicted of conspiracy in violation of 18 U.S.C. § 371, the Sentencing Guidelines directed the sentencing court to determine the base offense level "from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." U.S.S.G. § 2X1.1(a).

§ 1B1.5(b)(2). Here, the cross-reference in § 2B5.1(b)(1) is only to the table at § 2F1.1, not to the entire guideline. Thus, only the table, and not the entire guideline, can be relied upon in determining the applicable increase in the offense level directed by § 2B5.1(b)(1). The narrow scope of this cross-reference makes perfect sense in light of the focus of § 2B5.1(b)(1) on the "face value" of the counterfeit obligations at issue (as opposed to the general focus of § 2F1.1 on "loss").

The Fifth Circuit's recent opinion in <u>United States v. Cho</u>, 136 F.3d 982 (5th Cir. 1998), is instructive. Defendant pleaded guilty to two counts of trafficking counterfeit goods, in violation of 18 U.S.C. § 2320(a). Defendant was sentenced under U.S.S.G. § 2B5.3 which, similar to § 2B5.1, mandates a base offense level of six and directs an increase in the offense level pursuant to the table at § 2F1.1 where "the retail value of the infringing items exceed[s] $2,000." Applying these provisions, the sentencing court determined the retail value of the counterfeit merchandise at issue was $123,921 and, accordingly, increased defendant's offense level by seven levels pursuant to the table at § 2F1.1. On appeal, defendant challenged this determination, arguing "once the infringing items cross the $2,000 'retail value' threshold of § 2B5.3, a sentencing court should then, according to the plain language of § 2F1.1(b)(1), calculate the 'loss' resulting from [her] trademark infringement." 136 F.3d at 983. The Fifth

3

Circuit rejected defendant's interpretation. After noting the narrow reference in § 2B5.3 to "the table" in § 2F1.1, id. at 984, the court concluded "the retail value of the infringing items [rather than the loss] determines the § 2F1.1 enhancement." Id. at 986; see also United States v. Payne, 952 F.2d 827 (4th Cir. 1991) (because § 2B5.1(b)(1) refers only to table at § 2F1.1, government not entitled to apply two-level enhancement set forth in § 2F1.1(b)(2)).

Although we are dealing with § 2B5.1 in this case rather than § 2B5.3, nothing in the language of § 2B5.1 convinces me we should reach a result different from that in Cho. The bottom line is that, under the plain language of § 2B5.1, sentence enhancements for counterfeit currency crimes are based not upon "actual" or "intended" loss, but upon the face value of the counterfeit currency seized (and, in some cases, upon other offense characteristics such as whether the defendant produced counterfeit currency or was in possession of equipment or materials used to produce counterfeit currency). See generally United States v. Taftsiou, ___ F.3d ___, 1998 WL 254088 (3rd Cir. 1998) (offense levels properly increased based on face value of counterfeit notes); Melton, 131 F.3d at 1403 (offense level properly increased by sixteen levels where face value of counterfeit funds was $30 million); United States v. Wilson, 16 F.3d 418, 1994 WL 44847 (10th Cir. 1994) (table) (offense level properly increased by three levels because face value of counterfeit items was $11,500); United States v. Ramacci, 15 F.3d

4

75, 78 (7th Cir. 1994) (face value of counterfeit bills, including partially completed bills, is used to determine sentence enhancement under § 2B5.1(b)(1)); United States v. Boothe, 994 F.2d 63, 71 (2d Cir. 1993) (sentence properly enhanced by fifteen levels where offense involved more than $10 million in counterfeit currency); United States v. Delaney, 933 F.2d 1019, 1991 WL 85198 (10th Cir. 1991) (table) (sentence enhancement properly based on face value of notes rather than "actual loss" resulting from offenses where defendant manufactured over $2 million in counterfeit notes).

Because the district court properly applied the guidelines in determining Sims' sentence, I would affirm the sentence, as well as the conviction.