FILED
United States Court of Appeals
Tenth Circuit

June 11, 2020

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JEREMIAH U. SERR,

    Defendant - Appellant.

No. 19-1197
(D.C. No. 1:18-CR-00266-PAB-5)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **PHILLIPS**, **McKAY**[**], and **MORITZ**, Circuit Judges.
_____

Jeremiah Serr appeals his convictions for conspiracy and possession of

methamphetamine with intent to distribute. For the reasons explained below, we

affirm.

---

    [*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

    [**] Although the late Honorable Monroe G. McKay was assigned to and participated in the disposition of this matter before his death on March 28, 2020, his vote was not counted. *Yovino v. Rizo*, 139 S. Ct. 706, 710 (2019) (holding that federal court may not count vote of judge who dies before decision is issued). Yet if the remaining two panel judges are in agreement, "[t]he practice of this court permits [them] . . . to act as a quorum in resolving the appeal." *United States v. Wiles*, 106 F.3d 1516, 1516 n.* (10th Cir. 1997); *see also* 28 U.S.C. § 46(d) (noting that circuit court may adopt procedures permitting disposition of appeal where remaining quorum of panel agrees on disposition). The remaining panel members have acted as a quorum with respect to this order and judgment.

## Background

The evidence at trial showed that from October 2016 to May 2018, a group of individuals including Serr conspired to distribute methamphetamine from Colorado to Virginia. The government's primary witness was Christina Fitzgerald, a member of the conspiracy who pleaded guilty and agreed to cooperate with the government. Fitzgerald testified that in October 2016, when she was living in Virginia, Chris Karten asked her if she could obtain two pounds of methamphetamine for him. Fitzgerald contacted coconspirator Joanna Zarate-Suarez, who lived in Denver, about buying the methamphetamine that Karten requested.[1] According to Fitzgerald, she and Karten planned to meet Zarate-Suarez's courier, Mia (short for Jeremiah, Serr's first name), in Kansas City to exchange the money for the drugs. Serr was supposed to arrive in a silver Honda, but he never showed up.

Fitzgerald testified that Zarate-Suarez explained that Serr missed the meeting because he was stopped by police. Fitzgerald and Karten then drove to Colorado and completed the drug deal there, obtaining the methamphetamine directly from Zarate-Suarez and coconspirator Edwin Roman-Acevedo.

Along with Fitzgerald's testimony, the government presented evidence from the law-enforcement officer who arrested Serr in Kansas in October 2016. The officer testified that he clocked Serr driving 119 miles per hour on the highway. When the officer handed Serr the speeding ticket, he smelled marijuana in Serr's car. Serr told

---

[1] Fitzgerald explained that a pound of methamphetamine in Virginia cost $15,000 to $18,000, but in Colorado, the same quantity cost only $3,000 to $5,000.

the officer that he had smoked marijuana in the car and gave the officer a container with marijuana in it. The officer then searched the car and discovered a coffee thermos containing a crystal substance he believed to be methamphetamine. The forensic scientist who tested the crystal substance in a Kansas lab testified that it was 433.5 grams—about one pound—of methamphetamine. Serr pleaded guilty to a state charge for possessing methamphetamine with intent to distribute and spent several months incarcerated there; the state court eventually imposed a suspended sentence of 146 months in prison and placed Serr on probation for three years.

The next transaction occurred about a month later. Fitzgerald testified that in November 2016, Karten asked her to get more methamphetamine, so she contacted Zarate-Suarez again. This time, Fitzgerald flew to Colorado with Karten's girlfriend, Sarah MaGuire; they brought about $16,000 in cash. But Zarate-Suarez and Fitzgerald, along with another conspirator, Omar Gonzalez-Hernandez (Zarate-Suarez's husband), decided to rob MaGuire instead of completing the drug transaction. Roman-Acevedo and two other men drove MaGuire somewhere on the pretense of buying cigarettes, assaulted her, and left her by the side of the road. Meanwhile, Fitzgerald took all MaGuire's belongings and the $16,000 in cash from their hotel room, and Zarate-Suarez and Gonzalez-Hernandez drove Fitzgerald to a different hotel. Zarate-Suarez later divided up the cash, giving $500 to Fitzgerald, less than that to Roman-Acevedo and the other two men, and keeping the remainder for herself. A few days later, Fitzgerald drove back to Virginia with Roman-Acevedo, another man, and half of a pound of methamphetamine. About a month later,

3

Fitzgerald reported to prison to serve a sentence for previously violating the provisions of her supervised release.

Fitzgerald testified that after she was released from prison in 2018, Karten again contacted her, this time seeking six pounds of methamphetamine. Unbeknownst to Fitzgerald, Karten was now working as an informant for law enforcement. Fitzgerald contacted Zarate-Suarez, who said she could provide five pounds of methamphetamine. Fitzgerald flew to Denver in May 2018 and met up with Zarate-Suarez and Gonzalez-Hernandez. But when Zarate-Suarez, Fitzgerald, and Roman-Acevedo attempted to meet with Karten, law enforcement stopped their car for an equipment violation. And after a drug dog alerted to drugs in their car, they engaged in a high-speed car chase in which they attempted to dissolve the methamphetamine in water and discard it out the windows.

After the chase ended, law enforcement arrested Zarate-Suarez, Fitzgerald, and Roman-Acevedo. The following day, officers went to the house where Zarate-Suarez lived and found both Gonzalez-Hernandez and Serr there. The officers arrested Serr on an outstanding warrant unrelated to this case.

The government charged Zarate-Suarez, Fitzgerald, Serr, Gonzalez-Hernandez, and Roman-Acevedo with conspiring to distribute methamphetamine. In relevant part, it further charged Serr with possessing methamphetamine with intent to distribute in October 2016. The jury convicted Serr on both counts.[2] The district

---

[2] Zarate-Suarez, Fitzgerald, and Roman-Acevedo entered guilty pleas. The government tried Serr and Gonzalez-Hernandez together.

court sentenced Serr to the statutory minimum, ten years in prison. *See* 21 U.S.C. § 841(b)(1)(A)(viii). Serr appeals, challenging his convictions.

**Analysis**

## I.     Conspiracy

Serr first urges us to reverse his conspiracy conviction because, as he argued below in his motion for acquittal, the evidence supporting the existence of the overarching conspiracy was insufficient. We review a challenge to the sufficiency of the evidence de novo, including one that arises in a motion for acquittal under Federal Rule of Criminal Procedure 29, "viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government." *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015) (quoting *United States v. Hale*, 762 F.3d 1214, 1222 (10th Cir. 2014)).

Serr specifically argues that the district court should have granted his motion for acquittal because the government failed to show the existence of one large conspiracy and instead proved only three smaller conspiracies. "To prove a conspiracy, the government must establish: (1) that an agreement existed between two or more people to violate the law; (2) that the defendant knew at least the conspiracy's essential objectives; (3) that the defendant knowingly and voluntarily became a part of the conspiracy; and (4) that the co[]conspirators were interdependent." *United States v. Hill*, 786 F.3d 1254, 1266 (10th Cir. 2015).

Though Serr does not expressly tie his argument to any specific element of conspiracy, he generally contends that there was insufficient evidence tying him to

5

the conspiracy alleged in the indictment, which spanned from October 2016 to May 2018. We interpret this general argument as a challenge to the interdependence element. *See, e.g.*, *United States v. Caldwell*, 589 F.3d 1323, 1329 (10th Cir. 2009) ("In reviewing a jury's determination that a single conspiracy existed, 'a focal point of the analysis is whether the alleged coconspirators' conduct exhibited interdependence.'" (quoting *United States v. Edwards*, 69 F.3d 419, 432 (10th Cir. 1995))). We do so because "a single conspiracy does not exist solely because many individuals deal with a common central player. What is required is a *shared*, single criminal objective, not just similar or parallel objectives between similarly situated people." *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005) (citation omitted) (quoting *United States v. Evans*, 970 F.2d 663, 670 (10th Cir. 1992)). And interdependence gets to this question, asking whether "coconspirators 'inten[d] to act together for their shared mutual benefit within the scope of the conspiracy charged.'" *Caldwell*, 589 F.3d at 1329 (alteration in original) (quoting *Evans*, 970 F.2d at 671).

To support his multiple-conspiracy argument, Serr relies on *Kotteatkos v. United States*, 328 U.S. 750 (1946), *United States v. Baldridge*, 559 F.3d 1126 (10th Cir. 2009), and *United States v. Carnagie*, 533 F.3d 1231 (10th Cir. 2008). But these cases are distinguishable because, critically, they involved financial conspiracies rather than drug conspiracies. And "because the underlying transaction [in a financial conspiracy] is generally lawful, one cannot infer an illegal common purpose in the same way that a common purpose could be found in a drug conspiracy," in which "[e]ach participant is presumptively aware of the illegal nature of the activity."

6

*Carnagie*, 533 F.3d at 1239 n.5. Thus, "there is a higher standard for proving interdependence in" financial conspiracies. *Baldridge*, 559 F.3d at 1136–37. Because this case involves a drug conspiracy, statements from *Kotteatkos*, *Baldridge*, and *Carnagie* about the burden of proving overarching versus separate conspiracies provide little guidance here.

Instead, this case presents a typical drug conspiracy in which we can infer that Serr shared an illegal common purpose with Zarate-Suarez, Fitzgerald, and the other conspirators—and acted on that purpose—from the simple fact that he attempted to deliver methamphetamine from Zarate-Suarez to Fitzgerald in October 2016. *See Caldwell*, 589 F.3d at 1329 (noting that "a single act can be sufficient to demonstrate interdependence"). But Serr contends that such an inference fails here because Fitzgerald testified that she made three separate agreements with Zarate-Suarez: one in October 2016, one in November 2016, and one in May 2018. He asserts that based on this testimony, the jury could only have found three separate conspiracies, not one larger conspiracy.

Yet the existence or breadth of a conspiracy is not a question on which testimony from a single fact witness is definitive; it is a question to be answered by the jury by comparing the evidence it has heard against the legal definition of conspiracy. *See id.* (noting that because "[d]istinguishing between a single, large conspiracy and several smaller conspiracies is often difficult," appellate courts often "defer to the jury's determination of the matter"). Moreover, a single conspiracy does not fracture into multiple conspiracies merely because it involves a series of separate

7

transactions. *See United States v. Brewer*, 630 F.2d 795, 799 (10th Cir. 1980) ("The simple fact 'that a number of separate transactions may have been involved . . . does not establish the existence of a number of separate conspiracies.'" (alteration in original) (quoting *United States v. Parnell*, 581 F.2d 1374, 1382 (10th Cir. 1978))). Thus, when deciding whether Serr was guilty of conspiring with Zarate-Suarez, Fitzgerald, Gonzalez-Hernandez, and Roman-Acevedo, the jury was free to weigh Fitzgerald's testimony about three separate agreements and the other evidence it heard against its instructions defining a conspiracy. Those instructions included details on single versus multiple conspiracies as well as Serr's multiple-conspiracy theory of the case. Stated more plainly, Fitzgerald's testimony about "separate agreement[s]" does not render the government's conspiracy evidence insufficient and thus take that question away from the jury. R. vol. 5, 704.

Next, Serr points out that no evidence directly connected him to the November 2016 or May 2018 events. In particular, he points out that his October 2016 arrest in Kansas and his incarceration there through about mid-February 2017 precluded his involvement in the November 2016 events. "But 'a conspiracy does not end simply because one conspirator has been arrested . . . .'" *United States v. Alcorta*, 853 F.3d 1123, 1139 (10th Cir. 2017) (quoting *United States v. Melton*, 131 F.3d 1400, 1405 (10th Cir. 1997)); *see also United States v. Fishman*, 645 F.3d 1175, 1190 (10th Cir. 2011) ("A single conspiracy does not splinter into multiple conspiracies because members come and go."). Moreover, although Serr contends that his "involvement ended with his arrest in Kansas," Aplt. Br. 24, "a conspirator's arrest or incarceration

8

by itself is insufficient to constitute his withdrawal from the conspiracy," *Alcorta*, 853 F.3d at 1139 (quoting *Melton*, 131 F.3d at 1405). On the contrary, "'each member of the conspiracy is legally responsible for the crimes of fellow conspirators' . . . 'until the conspiracy accomplishes its goals or that conspirator withdraws.'" *United States v. Randall*, 661 F.3d 1291, 1294 (10th Cir. 2011) (first quoting *United States v. Russell*, 963 F.2d 1320, 1322 (10th Cir. 1992), then quoting *United States v. Brewer*, 983 F.2d 181, 185 (10th Cir. 1993)). Thus, the absence of evidence directly connecting Serr to the latter transactions does not render the government's conspiracy evidence legally insufficient.

Further, Serr acknowledges the government's circumstantial evidence connecting him to the other conspirators: law enforcement found Serr at Zarate-Suarez's house the day after Zarate-Suarez's arrest; Serr lived in the same neighborhood as Zarate-Suarez; and a witness testified that Serr knew the Zarate-Suarez family. And, most importantly, the evidence showed that Kansas law enforcement arrested Serr while he was driving through Kansas on his way to deliver methamphetamine from Zarate-Suarez to Fitzgerald. "[A] single act can be sufficient to demonstrate interdependence" and to show that an individual intended to act for the "shared mutual benefit" of the conspiracy. *Caldwell*, 589 F.3d at 1329. Thus, from this evidence and contrary to Serr's argument, a reasonable jury could have concluded that he was a member of the conspiracy to distribute methamphetamine from Colorado to Virginia that stretched from October 2016 to May 2018 and involved Zarate-Suarez, Fitzgerald, Gonzalez-Hernandez, and Roman-Acevedo. We

therefore reject Serr's argument that the district court erred in denying his motion for acquittal on the conspiracy charge.[3]

In a related argument, Serr contends that the district court erred in admitting evidence of events that occurred after his October 2016 arrest because the arrest automatically and involuntarily terminated his participation in any ongoing conspiracy. *See* Fed. R. Evid. 801(d)(2)(E) (permitting courts to admit as evidence statements "made by the party's coconspirator[s] during and in furtherance of the conspiracy"). But Serr concedes that the we need not reach this issue unless we first determine that his arrest withdrew him from the conspiracy.

Generally, to withdraw from a conspiracy, "an individual must take affirmative action, either by reporting to the authorities or by communicating his intentions to the coconspirators." *Randall*, 661 F.3d at 1294 (quoting *United States v. Powell*, 982 F.2d 1422, 1435 (10th Cir. 1992)). The affirmative-withdrawal requirement means that "[m]ere cessation of one's participation in a conspiracy is insufficient to demonstrate withdrawal." *Id.* (quoting *United States v. Hughes*, 191 F.3d 1317, 1321 (10th Cir. 1999)). In other words, "[p]assive nonparticipation in the continuing

---

[3] For the same reason, we reject Serr's variance argument. *See Carnagie*, 533 F.3d at 1237 ("A variance arises when an indictment charges a single conspiracy but the evidence presented at trial proves only the existence of multiple conspiracies."). "We treat a conspiracy[-]variance claim as an attack on the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy." *Hill*, 786 F.3d at 1266 (quoting *Carnagie*, 533 F.3d at 1237). Here, as already discussed, the evidence at trial was sufficient for a reasonable jury to find the existence of the conspiracy as charged. Thus, no variance occurred. *See United States v. Marquez*, 898 F.3d 1036, 1043 (10th Cir. 2018) (rejecting variance argument because evidence of conspiracy was sufficient).

10

scheme is not enough to sever the meeting of minds that constitutes the conspiracy." *Smith v. United States*, 568 U.S. 106, 112–13 (2013).

Despite this clear requirement that an individual generally must affirmatively withdraw from a conspiracy, Serr relies on three main cases to support his position that his arrest automatically and involuntarily terminated his participation in the conspiracy: *United States v. Dunn*, 775 F.2d 604 (5th Cir. 1985), *United States v. Smith*, 578 F.2d 1227 (8th Cir. 1978), and *Melton*, 131 F.3d 1400. Yet none of these cases support Serr's argument. For example, Serr is correct that in *Melton* we ultimately concluded that the defendant's "role in the conspiracy ended with his arrest."[4] 131 F.3d at 1405–06. But before doing so, we specifically stated that "a conspirator's arrest or incarceration *by itself* is insufficient to constitute his withdrawal from the conspiracy." *Id.* at 1405 (emphasis added). Instead, only in "certain circumstances" may an arrest "amount to a withdrawal." *Id.* Moreover, the circumstances in *Melton* included a new conspiracy after the defendant's arrest that replaced the original agreement and a concession from the government that the arrest terminated the defendant's role in the conspiracy. *See id.* at 1402–05. But here, the same conspiracy to distribute methamphetamine continued after Serr's arrest and his return to Colorado and the government has not conceded that Serr's arrest terminated his role in the conspiracy.

---

[4] Although it is not entirely clear, it appears that the defendant's arrest in *Melton* was for his role in the conspiracy, not for some other crime. *See* 131 F.3d at 1402. Thus, *Melton* likely contains the same role-in-the-conspiracy limitation as *Dunn* and *Smith*.

11

The out-of-circuit cases Serr cites are also unpersuasive. In *Dunn*, the court stated that an individual's "participation in a conspiracy ends when that person is arrested *for his* [*or her*] *role in the conspiracy*." 775 F.2d at 607 (emphasis added). And Serr's Kansas arrest was for possessing methamphetamine, not for his role in this conspiracy. Although the government introduced evidence that Serr was carrying the drugs from Zarate-Suarez to Fitzgerald in furtherance of this conspiracy, he never told Kansas law enforcement as much; indeed, Kansas prosecuted Serr only for possessing drugs, not for conspiracy. Thus, *Dunn* is inapposite. As for *Smith*, Serr quotes from a concurring opinion that states "[a]lthough the arrest of one coconspirator terminates his membership in the conspiracy, it does not follow that the conspiracy itself is terminated." 578 F.2d at 1237 (Lay, J., concurring). As support for that statement, the *Smith* concurrence cites *United States v. Williams*, 548 F.2d 228 (8th Cir. 1977). There, the defendant argued that the overall conspiracy terminated when two of its members were arrested for their role in the conspiracy. *See Williams*, 548 F.2d at 231. Thus, by citing *Williams*, the *Smith* concurrence incorporates the same role-in-the-conspiracy limitation that appears in *Dunn* and is unpersuasive for the same reason. Indeed, as the government points out, the Eighth Circuit's binding precedent contradicts Serr's reading of the *Smith* concurrence: in *United States v. Johnson*, the court stated plainly that "[i]ncarceration alone does not constitute withdrawal." 737 F.3d 522, 526 (8th Cir. 2013).

Recognizing the limitations of this caselaw, Serr urges that "[t]o the extent that the law in the Tenth Circuit does not allow a distinction between termination by

arrest and voluntary withdrawal," this court should "re-examine its case[]law." Aplt. Br. 29. But we are bound by our prior precedent. *Barnes v. United States*, 776 F.3d 1134, 1147 (10th Cir. 2015). And that precedent requires more than an arrest for a crime other than the conspiracy to show withdrawal from a conspiracy. *See Melton*, 131 F.3d at 1405. We therefore reject Serr's argument that his arrest automatically and involuntarily terminated his role in the conspiracy.

And because Serr cannot meet the governing affirmative-withdrawal standard, he remained a member of the conspiracy during the events that took place after his arrest. The district court therefore did not err in admitting evidence of these later events under Rule 801(d)(2)(E).

## II. Drug Possession

Serr next argues that the evidence was insufficient to support his conviction for possessing methamphetamine with intent to distribute.[5] As noted earlier, we review sufficiency challenges de novo, viewing the evidence in the light most favorable to the government. *See Dewberry*, 790 F.3d at 1028. To prove this particular possession crime, the government had to show that Serr possessed at least 50 grams of pure methamphetamine. *See* § 841(b)(1)(a)(viii). And Serr specifically argues that because of a critical gap in the chain of custody, a reasonable jury could not have concluded that the tested substance was the same substance seized from Serr's vehicle during his Kansas arrest. *See United States v. Thomas*, 749 F.3d 1302,

---

[5] Serr preserved this argument when he made a general motion for acquittal below. *See United States v. Anthony*, 942 F.3d 955, 972 & n.13 (10th Cir. 2019).

1312 (10th Cir. 2014) (noting that "deficiencies in the chain of custody . . . affect the 'weight of the evidence, not its admissibility'" (quoting *United States v. Cardenas*, 864 F.2d 1528, 1531 (10th Cir. 1989))).

Serr correctly notes a gap in the chain of custody. The government presented evidence showing that law enforcement transferred the seized drugs from Serr's car to a Kansas lab, from the Kansas lab to a Kansas storage facility, and from the Kansas storage facility to a Drug Enforcement Agency (DEA) office in Colorado. The government further presented evidence showing that a Colorado DEA agent mailed the drugs to a DEA lab in California. But the next witness the government presented was the DEA chemist in California who tested a drug sample and determined its purity. The government presented no testimony or exhibit definitively establishing that (1) the California DEA lab received the drugs that the DEA agent mailed from Colorado or (2) the drugs the California DEA chemist tested were the drugs that the DEA agent mailed from Colorado. Indeed, the DEA chemist could not speak to the condition of the package when it arrived or provide the name of the person who received the package in California. He explained that this chain-of-custody information was available on a form called a DEA-7, which he reviewed before testifying but did not have before him on the stand.

Nevertheless, two pieces of evidence support the inference that the drugs mailed from Colorado and the drugs tested in California were the same. First, the DEA chemist's report showed that the lab received the drugs on July 25, 2018—two days after the Colorado DEA agent testified that he sent the drugs to California.

14

Second, the recorded weights are strikingly similar: the Kansas lab weighed the *unpackaged* drugs at 433.5 grams; the Colorado DEA agent weighed the *packaged* drugs at about 480 grams; and the California DEA chemist similarly weighed the unpackaged drugs at 430.6 grams and the packaged drugs at 479.9 grams.[6]

Thus, despite the gap in the chain of custody, a reasonable jury could conclude that the drugs the California DEA chemist tested were the same drugs that law enforcement seized from Serr in Kansas. *See United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013) (noting that sufficiency standard is whether, viewing evidence "in the light most favorable to the government[,] . . . a reasonable jury could find [the defendant] guilty beyond a reasonable doubt" (third alteration in original) (quoting *United States v. Kaufman*, 546 F.3d 1242, 1263 (10th Cir. 2008))). We therefore affirm Serr's conviction for possessing methamphetamine with intent to distribute.

**Conclusion**

Because the evidence was sufficient for a reasonable jury to conclude that there was one overarching conspiracy, the district court did not err in denying Serr's acquittal motion. For the same reason, the district court correctly found no variance when denying Serr's motion for a new trial. Further, Serr never affirmatively

---

[6] We also note that Serr presented no evidence suggesting that any kind tampering occurred, that the Colorado DEA agent or the California DEA chemist acted outside of normal protocols, or that the California DEA lab's systems for receiving and logging evidence were inadequate or faulty in some way. *Cf. United States v. Lott*, 854 F.2d 244, 250 (7th Cir. 1988) (noting that "absent any evidence to the contrary, the court presumes that [public officers'] official duties have been discharged properly").

withdrew from the conspiracy, so the district court did not err in admitting evidence of events in the conspiracy that followed Serr's arrest and did not directly involve Serr. Finally, although the government's chain-of-custody evidence was imperfect, a reasonable jury could conclude that the drugs tested at the federal lab in California were the same drugs seized from Serr's car in Kansas. Accordingly, we affirm.

Entered for the Court


Nancy L. Moritz
Circuit Judge