FILED
United States Court of Appeals
Tenth Circuit

January 26, 2022

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

MARVIN LEE ELLIS,

     Defendant - Appellant.

No. 19-3148

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:12-CR-20066-KHV-30)**

---

Christopher M. Joseph, Joseph, Hollander & Craft LLC, Topeka, Kansas, on the
briefs for Defendant-Appellant.

Carrie N. Capwell, Assistant United States Attorney (Duston J. Slinkard, Acting
United States Attorney, with her on the brief), Office of the United States
Attorney, Topeka, Kansas, for Plaintiff-Appellee.

---

Before **HOLMES**, **SEYMOUR**, and **MORITZ**, Circuit Judges.

---

**HOLMES**, Circuit Judge.

---

     A jury convicted Marvin Lee Ellis of, among other crimes, conspiring to

manufacture, distribute, or possess with the intent to distribute cocaine and

cocaine base, in violation of 21 U.S.C. § 846 and 18 U.S.C. § 2. The district court sentenced Mr. Ellis to a term of 303 months' imprisonment, to be followed by 13 years of supervised release.

The district court imposed this sentence in a resentencing proceeding. In Mr. Ellis's previous appeal, we had upheld his convictions in a published decision but had vacated the court's sentencing order with respect to his conspiracy conviction and remanded for resentencing. *See United States v. Ellis* (*Ellis I*), 868 F.3d 1155, 1181 (10th Cir. 2017). In this appeal, Mr. Ellis presents two challenges. First, he contends that the district court misapplied the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") by failing to make particularized findings regarding the scope of his jointly undertaken criminal activity with his coconspirator Ataven Tatum. Second, and relatedly, Mr. Ellis argues that the evidence did not support a judicial finding that he agreed to participate in jointly undertaken criminal activity with Mr. Tatum; accordingly, the drug quantities associated with Mr. Tatum's purchases of cocaine should not be attributed to him for sentencing purposes.

Exercising jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, we **affirm** the district court's sentencing judgment.

2

**I**

**A**

The factual background is detailed in *Ellis I*. *See* 868 F.3d at 1160–64. We focus here on those factual circumstances most relevant to our resolution of Mr. Ellis's appellate challenges. In 2009, the Drug Enforcement Administration ("DEA") began investigating a Mexican narcotics-trafficking network that was supplying cocaine to the Kansas City, Kansas area. Specifically, DEA agents learned that powder cocaine was being distributed to Kansas City drug dealers, including Djuane Sykes, who in turn sold large amounts of powder cocaine to several customers—including the defendant, Mr. Ellis, and Mr. Tatum.

Mr. Tatum introduced Mr. Ellis to Mr. Sykes sometime in early fall of 2011. Shortly thereafter, Mr. Ellis and Mr. Tatum began purchasing powder cocaine from Mr. Sykes and cooking the cocaine into cocaine base—i.e., crack—for sale to customers. Mr. Ellis's nephew, Theoplis Ellis ("Theoplis"),[1] assisted both men in their drug-trafficking activities, including picking up and delivering drugs, and was compensated on a daily basis for his services. In various groupings, or separately, the three men traveled to visit Mr. Sykes to purchase powder cocaine. For example, on between ten to fifteen occasions, Mr.

---

[1]    Because the defendant, Marvin Ellis, and his nephew, Theoplis Ellis, share the same last name, we refer hereinafter to the latter only by his first name.

Ellis and Mr. Tatum traveled together to buy powder cocaine from Mr. Sykes. They also would journey separately to purchase powder cocaine from him. And, on at least one occasion, Mr. Ellis and Theoplis picked up and paid for powder cocaine from Mr. Sykes that Mr. Tatum had ordered.

In early 2012, primarily in the months of February and March, the DEA conducted a series of controlled buys of crack cocaine—through the use of confidential informants ("CIs")—from Mr. Ellis and Mr. Tatum. Some of these drug buys took place on various streets in Kansas City. Notably, on three occasions, Mr. Ellis and Mr. Tatum were together when the drug transactions took place. Two of the three involved the use of Mr. Tatum's vehicle. In one instance, Mr. Ellis effectively acted as the go-between—shuttling between the CI's vehicle and Mr. Tatum's: Mr. Ellis entered the CI's vehicle and obtained the money; took the money and delivered it to Mr. Tatum, whereupon he received the crack; and then he returned with the crack and handed it to the CI through the vehicle's window. In another instance, a CI entered Mr. Tatum's vehicle to purchase crack and reported that Mr. Ellis was present in the vehicle. And, during the third transaction, Mr. Ellis entered the CI's vehicle from the street—delivering some pills of molly[2] to him—and then, after Mr. Ellis exited

---

[2]     As we learn from *Ellis I*, molly is drug slang for "ecstasy/MDMA." 868 F.3d at 1161 (noting the seizure of "16 mollies" during Mr. Ellis's arrest).

the vehicle, Mr. Tatum entered it and sold him crack. Moreover, in one street-level sale that Mr. Ellis made alone to a CI, he "bragged about obtaining his crack cocaine from 'Tater'"—Mr. Tatum's nickname. R., Vol. IV, ¶ 83, at 44 (Revised Presentence Report ("RPSR"), filed June 25, 2018).

Mr. Ellis and Mr. Tatum also sold crack and other illegal drugs from a residence that they shared at 921 Haskell Avenue ("921 Haskell"), in Kansas City, Kansas. And the DEA made several controlled purchases using CIs at this residence, including during the February 2012 time frame. By way of background, in October 2011, with Mr. Tatum's financial assistance, Mr. Ellis had leased the 921 Haskell residence. *See Ellis I*, 868 F.3d at 1163 ("The lease required [Mr.] Ellis to pay a $300 deposit and $600 for the first month's rent. Of this amount, [Mr.] Ellis paid $400, and [Mr.] Tatum paid $500."). And, in November 2011, Mr. Tatum had signed a contract for deed to buy it, agreeing to make payments to the current owner. Mr. Ellis had assumed the responsibility for all of the utilities at 921 Haskell, registering them in his name.

Mr. Ellis, Mr. Tatum, and Theoplis would primarily use a phone belonging to Mr. Tatum to communicate with customers regarding drug sales, including drug transactions carried out at 921 Haskell. Theoplis would assist in drug transactions that took place there. On at least one occasion when Mr. Ellis sold crack to a CI at 921 Haskell, Theoplis "functioned as a doorman." R., Vol. IV, ¶

5

78, at 43. On another occasion, a CI placed a call to Mr. Tatum's telephone number and made arrangements to purchase crack cocaine at 921 Haskell; however, it was Mr. Ellis, not Mr. Tatum, who greeted the CI at the door and took the CI's money in exchange for the crack. Moreover, a CI observed both Mr. Ellis and Mr. Tatum selling crack on the same occasion around early February 2012 at 921 Haskell. Sometime around mid-April 2012, Mr. Ellis had "a falling out with [Mr.] Tatum," *Ellis I*, 868 F.3d at 1163, apparently because Mr. Tatum treated Mr. Ellis "poorly and always wanted to act like the 'boss,'" R., Vol. IV, ¶ 96, at 46. And, as a consequence, Mr. Ellis moved out of 921 Haskell.

**B**

In October 2012, a grand jury sitting in the District of Kansas issued a 112-count Second Superceding Indictment (the "Operative Indictment")[3] against fifty-one defendants, including Mr. Ellis, Mr. Tatum, and Theoplis. Most relevant here is Count 1, which charged the fifty-one defendants, including Mr. Ellis, with violating 21 U.S.C. § 846 for

---

[3]     The Operative Indictment was not included in the record designated for this appeal. However, it is discussed in *Ellis I*. *See* 868 F.3d at 1161. And, to offer a more comprehensive factual picture of relevant matters, we exercise our discretion to take judicial notice of the district court's files containing this document. *See, e.g.*, *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007) ("[W]e may exercise our discretion to take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand.").

[k]nowingly and intentionally conspir[ing] and agree[ing] together and with each other, . . . to manufacture, to possess with intent to distribute and to distribute 280 grams or more of cocaine base, "crack," . . . and to possess with intent to distribute and to distribute five kilograms or more of . . . cocaine . . . .

Second Superceding Indictment, Case No. 12-20066-01 through 32 and 34 through 52-KHV/JPO, ECF No. 245 (D. Kan., filed Oct. 3, 2012).

A jury returned guilty verdicts against Mr. Ellis on this conspiracy charge (i.e., Count 1) and on his other charged offenses—including, notably, Count 100, which charged Mr. Ellis with maintaining a residence for the purpose of manufacturing and distributing cocaine and cocaine base in violation of 21 U.S.C. § 856(a)(1). In *Ellis I*, we affirmed all of Mr. Ellis's convictions but, for reasons not relevant here, "we reverse[d] [Mr.] Ellis's conspiracy sentence and remand[ed] for a full resentencing." 868 F.3d at 1181. That resentencing is the subject of this appeal.

## C

In anticipation of the resentencing proceeding, with the aid of the Guidelines,[4] the U.S. Probation Office prepared a Revised Presentence Report or the RPSR. The RPSR reported that the total drug quantity applicable to Mr. Ellis was 2,602.53 grams, or 2.6 kilograms, of cocaine base. It left no doubt that the

---

[4]     The Probation Office used the 2016 edition of the Guidelines. The parties do not object to this choice on appeal. Accordingly, we also rely on this edition in our analysis.

cocaine base attributed to Mr. Ellis did not merely reflect his personal drug-trafficking activities but, rather, reflected his jointly undertaken criminal activities with Mr. Tatum and Theoplis.  Regarding their collective endeavors, the RPSR expressly found that Mr. Tatum "worked in concert with Marvin Ellis and Theoplis Ellis, who would all work together to sell 'crack' cocaine to various street level customers." *See* R., Vol. IV, ¶ 75, at 42–43.  Moreover, the RPSR concluded that "[Mr.] Ellis [wa]s responsible for cocaine attributed to [Mr.] Tatum for the approximate 6 month period in which Marvin Ellis was deemed to be involved with [Mr.] Tatum's drug trafficking activities." *See id.*, ¶ 109, at 49.

Further, the RPSR made specific findings as to the jointly undertaken criminal activity involving Mr. Ellis and Mr. Tatum:

> Marvin Ellis and Ataven Tatum were involved in jointly undertaken criminal activity that included purchasing cocaine from Djuane Sykes and selling crack cocaine at various locations together in the community and from 921 Haskell Street.  Their jointly undertaken criminal activity is also demonstrated by [Mr.] Tatum's phone being utilized to arrange a sale that was later consummated by Marvin Ellis, and Marvin Ellis accompanying and assisting [Mr.] Tatum with drug deals.

*Id.*, ¶ 107.  Moreover, in this same vein, the RPSR indicated that the conduct of Mr. Ellis and Mr. Tatum shed light on the scope of their jointly undertaken criminal activity.  This included an instance when the two men "jointly purchased drugs from Djuane Sykes . . . and used the 921 Haskell residence, *jointly*, from

8

which to sell crack cocaine" and, further, when "they also engaged in drug sales together in the community." *Id.*, ¶ 325, at 109 (emphasis added).

The RPSR also emphasized the significance of the two men's shared residence at 921 Haskell in establishing their jointly undertaken criminal activity—specifically, finding this reflected an "explicit agreement" between Mr. Tatum and Mr. Ellis, assigning Mr. "Ellis[] responsibility for the utilities and [Mr.] Tatum[] responsibility as the renter" of 921 Haskell. *Id.* And, notably, there also was an "implicit agreement" that the "two [men would] cook crack cocaine and sell crack cocaine from the residence." *Id.* The RPSR found the "jointly undertaken criminal activity" was demonstrated as well by "[Mr.] Ellis and Theoplis [] picking up drugs that [Mr.] Tatum ordered, and [through the] occasional use of a common phone associated with arranging drug transactions." *Id.*

Having determined the applicable drug quantity, the RPSR found the base offense level applicable to the combined counts to be 32. Significantly, because Mr. Ellis "maintained a residence (921 Haskell) for the purpose of manufacturing or distributing a controlled substance," the RPSR added two levels to his base offense level. *Id.*, ¶ 118, at 51. With additional upward adjustments not relevant here, the RPSR ended up assigning Mr. Ellis an adjusted offense level of 36.

9

Mr. Ellis objected to (among other things) the total drug quantity that the RPSR attributed to him; he argued that it was "improperly inflated." *Id.*, ¶ 288, at 101.[5]  More specifically, he challenged the attribution to him of all of the powder cocaine that Mr. Tatum purchased from Mr. Sykes between August 2011 and May 2012 because, according to Mr. Ellis, the evidence failed to demonstrate that he had entered into an agreement with Mr. Tatum pertaining to Mr. Tatum's purchases from Mr. Sykes.  Mr. Ellis maintained that his dealings with Mr. Sykes were "independent" from Mr. Tatum's and, more specifically, that the evidence established that he and Mr. Tatum "were acting as independent street level dealers with a common source of supply [namely Mr. Sykes], rather than pooling resources and profits together." *Id.*, ¶¶ 298–99, at 103 (citing U.S.S.G. 1B1.3, cmt. 4(C)(vi)).  In fact, Mr. Ellis maintained that, "at least during some of the relevant time period," he and Mr. Tatum were "acting as competitors." *Id.*, ¶ 300, at 103.  As support, Mr. Ellis averred that the evidence showed that in one of the late March 2012 controlled buys, Mr. Ellis "told the [CI] to 'not mess' with [Mr.] Tatum anymore and to only contact him for drugs." *Id.*

However, the Probation Office generally rejected Mr. Ellis's objections. With Mr. Ellis's "response to the drug calculation" in mind, however, the

---

[5]     The Probation Office had circulated the RPSR to the parties before it was finalized and submitted for the court's consideration.  Mr. Ellis's objections were memorialized in the RPSR's addendum.

Probation Office did adopt the government's view that a "somewhat shorter time frame" should be used for attributing Mr. Tatum's drug transactions to Mr. Ellis—specifically, the six-month period from October 2011 to April 2012. *Id.*, ¶ 273, at 97; *see id.*, ¶ 238, at 85 (discussing the government's proposal that Mr. Ellis "should be held accountable for the drugs attributed to [Mr.] Tatum . . . for a 6-month period, beginning in mid-October 2011, and ending in mid-April 2012").

**D**

At the resentencing, the district court heard arguments—based on the trial evidence—regarding "defendant's objection to the total drug quantity attributed to him." R., Vol. III, at 57 (Sentencing Hr'g Tr., dated July 11, 2019). Mr. Ellis's counsel argued that the "open issue for the [G]uideline[s] calculation" related to "how much crack cocaine or how much drugs to attribute to Mr. Ellis." *Id.* at 59. He explained that the issue under the relevant conduct analysis was whether or not Mr. Tatum's independent purchases fell within the scope of jointly-undertaken criminal activity. Citing the Tenth Circuit's *Biglow* decision—apparently, the unpublished panel decision in *United States v. Biglow*, 635 F. App'x 398 (10th Cir. 2015) (unpublished)—Mr. Ellis's counsel explicitly noted "we've objected" to the scope of Mr. Tatum's purchases being attributed to Mr. Ellis. R., Vol. III, at 60. He emphasized that the "burden is on the government" to present sufficient evidence "to show that [Mr.] Tatum's purchases . . . should be attributed to [Mr.]

11

Ellis." *Id.* at 60–61. He opined that the government fell short of satisfying this burden.

The district court then heard from the government: it argued that Mr. Ellis and Mr. Tatum jointly engaged in buying powder cocaine and distributing crack, the proof of which was "adduced at trial through testimony and evidence and phone calls and surveillance and pictures and videos show[ing] that this activity was . . . within the scope of their jointly undertaken criminal activity." *Id.* at 79–80. The government contended that Mr. Ellis and Mr. Tatum used Theoplis as an "errand boy" to collect money and deliver drugs for them—similar to how the pair "jointly used the house, . . . [and] jointly used the car to go to drug deals" during the period of the DEA investigation. *Id.* at 80. Accordingly, Mr. Ellis and Mr. Tatum were involved in a joint criminal venture, reasoned the government, and it highlighted that the residence at 921 Haskell was the place—not only where both Mr. Tatum and Mr. Ellis lived—but also where they distributed cocaine base.

The district court found that the government had the better argument regarding the scope of jointly undertaken criminal activity. Consequently, it overruled Mr. Ellis's drug-quantity objection. Specifically, the court found:

> [U]nder [U.S.S.G. §] 1B1.3 subsection (a)(1)(B)[,] . . . it seems to me that the fact that both defendants are members of the same criminal conspiracy to distribute drugs . . . would establish jointly-undertaken criminal activity. Clearly both of them were engaged in drug deals and maintaining a drug house in furtherance of that drug criminal activity . . . .

*Id.* at 102–03.  The court also addressed whether Mr. Tatum's drug sales were reasonably foreseeable to Mr. Ellis.  In its analysis, the court stressed the fact that the two men "lived together and both did drug transactions out of the same house, [as to which] Mr. Ellis was responsible for utilities and had actually paid the down payment on the lease."  *Id.* at 103.

The court concluded it was "hard-pressed" to see how the government's evidence—which was materially consistent (as relevant here) with the RPSR's findings—failed to satisfy the requirements of the Guidelines for attributing Mr. Tatum's drugs to Mr. Ellis.  *Id.*  The court relied on the RPSR's findings regarding drug quantity "as the starting point" for calculating Mr. Ellis's offense level with one exception: the court determined that the total amount of cocaine base attributable to Mr. Ellis was 1.9 kilograms—rather than 2.6 kilograms, as the RPSR had found.  *See id.* at 112–13.  This alteration did not impact the offense level of 32, which the RPSR had calculated.  The court explicitly memorialized its findings and conclusion in its Amended Statement of Reasons, which expressly recognized the court's "adopt[ion] of the presentence investigation report [i.e., the RPSR]."  *Id.*, Vol. IV, at 256 (Amended Statement of Reasons, filed July 12, 2019).

The district court determined that Mr. Ellis's applicable Guidelines range for his offenses was 324 to 360 months' imprisonment.  This calculation excluded

13

Mr. Ellis's conviction under 18 U.S.C. § 924(c), for which he was subject to an additional 60-month consecutive sentence.  The court, however, granted Mr. Ellis's written request for a variance, which referenced his poor health condition.  Specifically, the court granted Mr. Ellis a 25% downward variance.  Taking the variance into account, the court sentenced him to a total prison term of 303 months, to be followed by 13 years of supervised release.

The district court filed its amended judgment, and Mr. Ellis filed a timely notice of appeal.

## II

### A

First, we must consider the proper scope of our review.  The parties disagree concerning whether Mr. Ellis has preserved his sentencing challenges or, alternatively, whether the standard of review for forfeited errors applies here—i.e., plain-error review.  *See, e.g.*, *United States v. Wolfname*, 835 F.3d 1214, 1217 (10th Cir. 2016) (applying the plain-error standard where the defendant "didn't raise []his argument below").  Mr. Ellis asserts that he "objected to [the court] counting [Mr.] Tatum's cocaine purchases as relevant conduct" and argued that such purchases "did not fall within the scope of relevant criminal activity [Mr. Ellis] agreed to jointly undertake."  Aplt.'s Opening Br. at 19 (citing *United States v. Patton*, 927 F.3d 1087, 1093 (10th Cir. 2019)); *see*

Aplt.'s Reply Br. at 4 (arguing that "the record shows that the ultimate question before this Court and the precise error [Mr.] Ellis asks this Court to reverse was addressed repeatedly and specifically in the district court, and, therefore, preserved for review").  Yet, in opposition, the government contends that we should review only for plain error because Mr. Ellis "did not raise his current objection before the district court."  Aplee.'s Resp. Br. at 16.  We conclude that Mr. Ellis's argument is more persuasive.

Succinctly stated, before the district court, Mr. Ellis sufficiently informed the district court of the need to make particularized findings concerning the scope of his jointly undertaken criminal activity with Mr. Tatum to preserve an objection to the court's alleged failure to make such findings.  And, relatedly, Mr. Ellis sufficiently preserved a challenge to the drug quantities that the court attributed to him—specifically arguing (as relevant here) that those quantities improperly included drugs that Mr. Tatum purchased for distribution.

The record fully supports our conclusion.  For example, Mr. Ellis's objections on these matters were memorialized as an addendum to the RPSR.  *See, e.g.*, R., Vol. IV, ¶ 288, at 101 (asserting that "[t]he total drug quantity attributed to Marvin Ellis is improperly inflated" (bold-face font omitted)); *id.*, ¶ 293, at 102 (asserting that the Probation Office "erroneously attributes to [Mr.] Ellis all of the powder cocaine that [Mr.] Tatum purchased from [Mr.] Sykes between August

15

2011 and May 2012"); *id.*, ¶ 297, at 103 ("The evidence does not demonstrate an agreement by [Mr.] Ellis to undertake any particular criminal activity with respect to the cocaine that [Mr.] Tatum purchased from [Mr.] Sykes—certainly not with respect to all of the powder cocaine [Mr.] Tatum purchased."); *id.*, ¶ 303, at 104 ("In light of the evidence establishing that [Messrs.] Tatum and Ellis functioned as independent distributors, even competitors, none of [Mr.] Tatum's cocaine purchases should be attributed to Ellis."); *see also id.*, ¶¶ 294–97, at 102–03 (discussing the Guidelines commentary and Tenth Circuit and other caselaw relating to the sentencing court's obligation to make particularized findings as to the scope of jointly undertaken criminal activity).

Furthermore, other parts of the record demonstrate that the district court was keenly aware that Mr. Ellis objected to the quantity of drugs that the Probation Office attributed to him for sentencing purposes and, more specifically, that Mr. Ellis grounded his drug-quantity objection primarily (as relevant here) on the contention that the Probation Office improperly found that he and Mr. Tatum had agreed to jointly undertake drug-trafficking activities. *See, e.g.*, *id.*, Vol. III, at 57–59 (evincing a discussion between Mr. Ellis's counsel and the district court regarding the "defendant's objection to the total drug quantity attributed to him," with his counsel articulating a concern as to "how much crack cocaine or how much drugs to attribute to Mr. Ellis"); *id.* at 60 (showing, in the context of

16

discussing objections, that Mr. Ellis's counsel emphasized that "what we're talking about is under relevant conduct whether or not these purchases -- and specifically talking about Mr. Tatum's independent purchases, whether or not they were within the scope of independent -- or jointly-undertaken activity").

Indeed, during the sentencing hearing, the court and defense counsel engaged in a lengthy colloquy, in which counsel attacked the Probation Office's finding regarding the scope of jointly undertaken criminal activity undertaken by Mr. Ellis and Mr. Tatum. *See id.* at 63–70 (showing a colloquy between Mr. Ellis's counsel and the court regarding Mr. Ellis's "objecti[on] to aggregating the drugs from [Mr.] Tatum and [Mr. Ellis]"). And, putting aside for a moment the issue of whether the district court properly resolved Mr. Ellis's objections, it cannot be said that the court did not consider them. *See id.* at 102–05 (evincing the court's consideration and explicit endeavor to resolve Mr. Ellis's objection concerning the scope of jointly undertaken criminal activity and noting the view of Mr. Ellis's counsel that the court's action on that jointly undertaken scope issue "really kind of overwhelms . . . how much to attribute to Mr. Ellis" in terms of drug quantity, rendering his objection on that matter effectively "moot[]").

And, importantly, counsel explicitly invoked during this colloquy a Tenth Circuit decision (albeit unpublished) that clearly underscored a sentencing court's obligation to make particularized findings regarding the scope of jointly

17

undertaken criminal activity and the "key" role that such findings play in the attribution of drug quantities to defendants. *Biglow*, 635 F. App'x at 401 ("The scope requirement is key: it means that just knowing of coconspirators' illicit activities, without more, will not suffice to attribute such activities to a defendant unless the activities are also within the agreement's scope."); *see* R., Vol. III, at 60 (showing the efforts of Mr. Ellis's counsel to analogize "the Tenth Circuit's *Biglow* decision" to the instant case, in support of his challenge to any attempt to "take Mr. Tatum's purchases and attribute [them] to Mr. Ellis," and stating "we've objected").

Given these circumstances, we believe that Mr. Ellis's counsel had done enough to preserve the sentencing challenges at issue here. *See United States v. Lopez-Avila*, 665 F.3d 1216, 1217–18 (10th Cir. 2011) (rejecting the government's argument for plain error review; instead, concluding the defendant adequately preserved his issue for appeal where "the issue was properly raised prior to the sentencing hearing, the judge was familiar with the argument, and the argument was addressed by the judge"); *see also Harris v. Sharp*, 941 F.3d 962, 979 (10th Cir. 2019) ("To preserve [an] issue in [the] district court, [a party] need[s] only to alert the court to the issue and seek a ruling."); *cf. United States v. Tena-Arana*, 738 F. App'x 954, 959 (10th Cir. 2018) (unpublished) (distinguishing the defendant's preserved argument in *Lopez-Avila* from the

18

argument before it by noting that, in *Lopez-Avila*, the defendant "explicitly raised and fully presented—including arguments and authorities in support—the procedural question raised on appeal").[6]

## B

## 1

Having concluded that Mr. Ellis has preserved the two sentencing challenges at issue, we inquire into the appropriate standard of review for each of them. In setting the stage for our analysis, let us revisit Mr. Ellis's challenges. First, Mr. Ellis contends that the district court misapplied the Guidelines by failing to make particularized findings regarding the scope of his jointly undertaken criminal activity with Mr. Tatum. Second, and relatedly, Mr. Ellis argues that the evidence does not support a judicial finding that he agreed to participate in jointly undertaken criminal activity with Mr. Tatum; therefore, the drug quantities associated with Mr. Tatum's six-month period of cocaine purchases at issue here should not be attributed to him for sentencing purposes.

Generally speaking, "[w]e review Mr. [Ellis's] sentence for reasonableness, applying a deferential 'abuse-of-discretion standard of review.'" *United States v.*

---

[6]     We deem the reasoning of the unpublished decisions cited herein to be persuasive and instructive. We do not accord them controlling weight and recognize that they are not binding on us. *See, e.g.*, *United States v. Willis*, 826 F.3d 1265, 1274 n.2 (10th Cir. 2016); *United States v. Kurtz*, 819 F.3d 1230, 1236 n.2 (10th Cir. 2016).

*Morrison*, 771 F.3d 687, 691 (10th Cir. 2014) (quoting *Gall v. United States*, 552 U.S. 38, 46 (2007)); *see Lopez-Avila*, 665 F.3d at 1218 ("Our overall standard of review is abuse of discretion."). Because both of Mr. Ellis's challenges relate to the propriety of the district court's calculation of his Guidelines sentence, our focus is on the procedural reasonableness of his sentence. *See United States v. Wittig*, 528 F.3d 1280, 1284 (10th Cir. 2008) (noting that the "procedural component" of reasonableness review "encompass[es] the method by which the sentence is calculated"); *accord United States v. Henson*, 9 F.4th 1258, 1284–85 (10th Cir. 2021); *see also United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) (noting that "[p]rocedural reasonableness addresses [*inter alia*] whether the district court incorrectly calculated or failed to calculate the Guidelines sentence").

In assessing procedural reasonableness, we are mindful of the generally applicable precept that "[w]e review factual findings for clear error and legal determinations de novo." *Lopez-Avila*, 665 F.3d at 1218–19 (italics omitted); *see United States v. Finnesy*, 953 F.3d 675, 688 (10th Cir. 2020) ("Typically '"we review legal questions regarding the application of the Sentencing Guidelines de novo," and "a district court's factual findings are reviewed only for clear error, giving due deference to the district court's application of the Guidelines to the facts."'" (quoting *United States v. Iley*, 914 F.3d 1274, 1278–79 (10th Cir.

2019))); *United States v. Craine*, 995 F.3d 1139, 1153 (10th Cir. 2021) ("This court reviews 'legal questions regarding the application of the Sentencing Guidelines de novo, and a district court's factual findings . . . for clear error.'" (quoting *Finnesy*, 953 F.3d at 688)). "An error of law is per se an abuse of discretion." *Lopez-Avila*, 665 F.3d at 1219 (citing *Koon v. United States*, 518 U.S. 81, 100 (1996)); *accord United States v. Dominguez*, 998 F.3d 1094, 1104 (10th Cir. 2021). Likewise, "[t]he district court abuses its discretion when a ruling is based on a clearly erroneous finding of fact." *United States v. Munoz*, 812 F.3d 809, 817 (10th Cir. 2016); *accord United States v. Hull*, 893 F.3d 1221, 1223 (10th Cir. 2018).

**2**

Turning to Mr. Ellis's challenges, we agree with him that his first one—alleging that the district court erred by not making particularized findings—presents a question of law that we review de novo. In effect, this challenge posits that the district court legally erred by misapplying the Guidelines. *See United States v. Melton*, 131 F.3d 1400, 1403–04 (10th Cir. 1997) (noting that "[w]e review the sentencing court's application of the guidelines de novo," and specifically determining that, by failing to make particularized findings, the sentencing court "misapplied the sentencing guidelines by improperly assuming that the scope of the criminal activity Mr.

21

Melton agreed to jointly undertake was the same as the scope of the entire conspiracy"); *see also United States v. Figueroa-Labrada*, 720 F.3d 1258, 1264 (10th Cir. 2013) ("A sentencing court must make particularized findings to support the attribution of a coconspirator's actions to the defendant as relevant conduct, whether or not the defendant asks it to do so or disputes the attribution. . . . The absence of particularized findings is error subject to *meaningful* review." (emphasis added) (citations omitted)).

Mr. Ellis also contends that his second challenge—entailing an inquiry into whether there was sufficient evidence to support a judicial finding that he agreed to participate in jointly undertaken criminal activity with Mr. Tatum—also is subject to de novo review. However, here we must disagree.

In arguing for de novo review, Mr. Ellis effectively urges us to follow the decisional path that we charted in our *Melton* decision. In that case, we concluded, first, that the sentencing court "failed to make such 'particularized findings' and misapplied the sentencing guidelines," and, then, instead of ordering a "remand for further proceedings" on the scope of jointly undertaken criminal activity, we conducted our own independent, de novo inquiry regarding whether the evidence was sufficient to support the alleged scope of such jointly undertaken activity and concluded that it was not. *See Melton*, 131 F.3d at 1404.

We suggested that we were permitted to conduct such a de novo inquiry "because the facts underlying the determination are undisputed." *Id.*

With an explicit citation to *Melton*, *see* Aplt.'s Opening Br. at 24, Mr. Ellis effectively says, so too here. He reasons that, "remand for further proceedings on the scope of [Mr. Ellis's] agreement is not needed," because "the parties do not dispute the facts themselves, but only their import for assessing the scope of [Mr. Ellis's] agreement." *Id.* He says that we independently "should make the ultimate determination as to whether the facts in the record prove that [Mr. Ellis] agreed to undertake any particular activity with respect to the cocaine that [Mr.] Tatum purchased from [Mr.] Sykes," and, based on this assessment, we should conclude that the government did not carry its burden to establish such jointly undertaken criminal activity. *Id.*; *see also* Aplt.'s Reply Br. at 10 (asserting that the district court erred in not making particularized findings and noting that "[s]uch error requires reversal," then urging us "to make an independent determination that the government has failed to prove that [Mr. Ellis] agreed to jointly distribute the cocaine [Mr.] Tatum purchased from [Mr.] Sykes").

However, Mr. Ellis's standard-of-review argument is fundamentally flawed. It is premised on Mr. Ellis's unstated belief that, as an antecedent matter, we will agree with him that the district court legally erred in not making particularized findings regarding the scope of jointly undertaken criminal activity—as the panel

23

did in *Melton*. And, once we have reached that conclusion, Mr. Ellis tacitly

reasons that we will be free—like the *Melton* panel—to independently assess (i.e.,

de novo) the sufficiency of the government's evidence concerning the scope of

jointly undertaken criminal activity. But, for reasons we explicate *infra*, Mr.

Ellis's premise is wrong: we do *not* conclude that the district court failed in its

duty to make particularized findings concerning the scope of jointly undertaken

criminal activity. In reaching such a holding, we effectively undercut the

apparent foundation for Mr. Ellis's argument—based on the example of *Melton*.

Furthermore, it does not appear, in light of our consideration of Mr. Ellis's

briefing, that he has a backup argument—not tethered to *Melton*'s example—for

the application of de novo review to the question of the sufficiency of the

evidence to support the court's finding concerning the scope of jointly undertaken

criminal activity. That is to say, it does not appear that Mr. Ellis has a backup

argument for de novo review that does *not* depend on us concluding, as an

antecedent matter, that the court legally erred by not making particularized

findings—a conclusion that we ultimately do not make. In particular, Mr. Ellis

offers no argument that at least assumes for the sake of argument that we would

conclude—as we do—that the district court did *not* err in making particularized

findings. Thus, the *Melton*-based argument that Mr. Ellis tacitly makes is

24

bootless because we do not conclude that the district court erred as to particularized findings, and he has no backup.

To be sure, citing our *Patton* decision, Mr. Ellis contends that "the ultimate determination of relevant conduct is subject to de novo review." Aplt.'s Opening Br. at 19 (citing *Patton*, 927 F.3d at 1093); *accord* Aplt.'s Reply Br. at 10. And the government agrees. *See* Aplee.'s Resp. Br. at 24 (citing *Patton*, 927 F.3d at 1093, and *United States v. Damato*, 672 F.3d 832, 838 (10th Cir. 2012), for the same proposition). Yet, even assuming that is so, it does not ineluctably follow that the evidentiary sufficiency of the court's findings as to subsidiary issues that make up the ultimate relevant conduct determination—such as the scope of jointly undertaken criminal activity, *see* U.S.S.G. § 1B1.3(a)(1)(B)(i)—are also reviewed de novo. *See United States v. Garcia*, 946 F.3d 1191, 1202 (10th Cir. 2020) ("[I]rrespective of the character of this ultimate relevant-conduct determination, [the defendant's] challenge here turns on whether the record provides a proper foundation for certain subsidiary 'factual findings in support of a determination of relevant conduct.'" (quoting *United States v. Griffith*, 584 F.3d 1004, 1012 (10th Cir. 2009))).[7]

---

[7]    We recognized in *Garcia* that there is internal tension in our caselaw concerning whether the overarching determination of relevant conduct is a question of law reviewed de novo or, instead, one of fact that we review for clear error. *See Garcia*, 946 F.3d at 1202; *see also United States v. Craig*, 808 F.3d

(continued...)

25

And, as to the scope question, our caselaw is clear— de novo review does *not* apply to the subsidiary finding concerning the scope of jointly undertaken criminal activity. We review the evidentiary sufficiency of a district court's finding as to the scope of jointly undertaken criminal activity only for clear error. *See United States v. Sells (Sells II)*, 541 F.3d 1227, 1235 (10th Cir. 2008) ("A district court's determination of the quantity of drugs attributable to a defendant, including the subsidiary questions of whether drugs were reasonably foreseeable to a defendant and *within the scope of the jointly undertaken criminal activity*, is a determination of fact reviewed only for clear error." (emphasis added)); *see also United States v. Lauder*, 409 F.3d 1254, 1267 (10th Cir. 2005) (considering "the sufficiency of the evidence" regarding a district court's determination of drug quantities attributable to the defendant and concluding that it "did not clearly err" in defining the scope of the defendant's jointly undertaken criminal activity); *cf. United States v. Tocco*, 306 F.3d 279, 284 (6th Cir. 2002) ("A district court's finding that the criminal acts of others in a jointly undertaken criminal activity are

---

[7](...continued)
1249, 1255 (10th Cir. 2015) *(*"We have been inconsistent in our decisions about whether a relevant conduct determination is a factual finding we must review for clear error or a legal conclusion we must review de novo."). However, as in *Garcia*, "[w]e need not delve into this matter further," 946 F.3d at 1202, because—as we discuss *infra*—it is clear that subsidiary issues like the scope of jointly undertaken criminal activity are factual in nature, and a court's determination of such issues is thus reviewed only for clear error.

reasonably foreseeable and in furtherance of the jointly undertaken criminal activity is reviewable for clear error.").

In sum, contrary to Mr. Ellis's arguments, we review his second challenge under the clear-error standard. This is a "deferential" standard. *United States v. Nkome*, 987 F.3d 1262, 1276 (10th Cir. 2021). Under this standard, "[i]f the 'court's account of the evidence is plausible in light of the record viewed in its entirety,' we may not reverse it even if we might have weighed the evidence differently." *United States v. Piper*, 839 F.3d 1261, 1271 (10th Cir. 2016) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)); *see United States v. Torres*, 53 F.3d 1129, 1144 (10th Cir. 1995) ("To constitute clear error, we must be convinced that the sentencing court's finding is simply not plausible or permissible in light of the entire record on appeal, remembering that we are not free to substitute our judgment for that of the district judge."). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574.

## III

We turn now to consider Mr. Ellis's two sentencing challenges. We begin with a brief overview of the relevant substantive law. And then we consider the merits of the challenges and determine that they do not warrant relief.

## A

27

"District courts calculate sentences by first determining the Guidelines section applicable to the statute under which the defendant was convicted." *Figueroa-Labrada*, 720 F.3d at 1265. As relevant here, the jury convicted Mr. Ellis under 21 U.S.C. § 846 for conspiracy to possess with the intent to distribute cocaine and cocaine base. Section 2D1.1 of the Guidelines applies to "Unlawful Manufacturing, Importing, Exporting, Trafficking, or Possession"—including conspiracy to possess with intent to distribute a controlled substance. U.S.S.G. § 2D1.1. The Guidelines base offense level is determined by the amount of the controlled substance—here, cocaine or cocaine base—that is properly attributable to the defendant. *See id.* § 2D1.1(a)(5).

At sentencing, a district court considers the offense of conviction's relevant conduct. Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant"; and, "in the case of a jointly undertaken criminal activity, . . . all acts and omissions of others that were: (i) within *the scope of the jointly undertaken criminal activity*, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." *Id.* § 1B1.3(a)(1)(A), (B) (emphasis added) (indenting omitted).

More specifically, in addition to a defendant's own criminal activities, the Guidelines commentary clarifies:

28

> With respect to offenses involving contraband (including controlled substances), the defendant is accountable . . . in the case of a jointly undertaken criminal activity under subsection (a)(1)(B), [for] all quantities of contraband that were involved in transactions carried out by other participants, if those transactions were within the scope of, and in furtherance of, the jointly undertaken criminal activity and were reasonably foreseeable in connection with that criminal activity.

*Id.* cmt. 3(D).

Mr. Ellis's arguments only implicate the scope of agreement criterion. In this regard, it is important to highlight that this is an "independent and necessary element[] of relevant conduct under §1B1.3(a)(1)(B)." *United States v. Green*, 175 F.3d 822, 837 (10th Cir. 1999) (quoting *United States v. Carreon*, 11 F.3d 1225, 1235 (5th Cir. 1994)); *accord United States v. Willis*, 476 F.3d 1121, 1129 (10th Cir. 2007); *see also Patton*, 476 F.3d at 1094 (discussing § 1B1.3(a)(1)(B)'s definition of relevant conduct, and noting "[u]nder that definition, scope of the agreement, furtherance, and reasonable foreseeability are 'independent and necessary elements of relevant conduct'" (quoting *Willis*, 476 F.3d at 1129)).

"Each member of a conspiracy may have had a different scope of jointly undertaken criminal activity and therefore different relevant conduct." *Figueroa-Labrada*, 720 F.3d at 1265. As the Guidelines commentary helpfully explains:

> Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the "jointly undertaken criminal activity" is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant. . . . [T]he court

must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement).

U.S.S.G. § 1B1.3 cmt. 3(B). Determining the scope of the agreement that a particular defendant joined in relation to the conspiracy as a whole requires the district court, at sentencing, "to analyze, and make 'particularized findings' about[] the scope of the specific agreement." *Melton*, 131 F.3d at 1404 (quoting *United States v. Thomas*, 114 F.3d 228, 255 (D.C. Cir. 1997)).

"The government bears the burden of proving by a preponderance of the evidence that the conduct of co-conspirators is to be attributed to the defendant for sentencing purposes." *Id.* at 1403. After hearing from the parties, in certain instances, the district court is permitted to adopt the presentence report's findings.[8] And, when that happens, "we review the information in [the report] as

---

[8] As we discuss *infra*, Mr. Ellis disputes the government's position that the district court here adopted the findings of the operative presentence report—that is, the RPSR. *See, e.g.*, Aplt.'s Reply Br. at 9 (noting that "the district court in this case never expressly adopted the report's factual findings"). Yet, notably, Mr. Ellis does not contend that the district court was legally precluded from adopting the RPSR's findings because his arguments triggered the court's "Rule 32 fact-finding obligation"—that is, because his arguments identified a specific "factual inaccuracy" or inaccuracies in the RPSR. *United States v. Rodriguez-Delma*, 456 F.3d 1246, 1253 (10th Cir. 2006); *cf. id.* at 1253 (noting that where the defendant only attacks a district court's application of the Guidelines to the historical facts, the fact-finding obligation is not triggered); *accord United States v. Cereceres-Zavala*, 499 F.3d 1211, 1214 (10th Cir. 2007). Indeed, on appeal, Mr. Ellis insists that the historical facts are not in dispute; at

(continued...)

if it were the findings of the district court." *Figueroa-Labrada*, 720 F.3d at 1266;

*see also United States v. Sells (Sells I)*, 477 F.3d 1226, 1242 (10th Cir. 2007)

(considering the presentence report's findings "adopted" by the sentencing court,

in determining whether the court's findings were legally sufficient).

**B**

Mr. Ellis first challenges the sentencing court's failure to make

particularized findings regarding the alleged scope of his jointly undertaken

criminal activity with Mr. Tatum. *See* Aplt.'s Opening Br. at 20–24. He focuses

on the court's statement that "the fact that both [Mr. Tatum and Mr. Ellis] are

members of the same criminal conspiracy to distribute drugs . . . would establish

jointly-undertaken criminal activity[,] . . . so really the question is whether the

sales by Mr. Tatum are reasonably foreseeable to Mr. Ellis." Aplt.'s Opening Br.

at 22–23 (bold-face font omitted) (quoting R., Vol. III, 102–03). Mr. Ellis

contends that "[a]ssuming [that] the scope of the criminal activity a co-

---

[8](...continued)
issue here, he says, is "only their import for assessing the scope of [Mr. Ellis's]
agreement to jointly undertake criminal activity." Aplt.'s Reply Br. at 16; *see*
Aplt.'s Opening Br. at 24 (noting, as to the scope determination, "the parties do
not dispute the facts themselves, but only their import for assessing the scope of
[Mr. Ellis's] agreement"). In any event, given Mr. Ellis's silence on the matter in
his briefing, any Rule 32 argument of this sort would be waived. *See, e.g.*, *United
States v. Bowline*, 917 F.3d 1227, 1231 (10th Cir. 2019) (noting that "when a
party omits an argument from its opening brief, an appellate court has no
obligation to consider that argument").

conspirator agreed to jointly undertake is the same []as the scope of the entire conspiracy is a misapplication of the Sentencing Guidelines." *Id.* at 21 (citing *Melton*, 131 F.3d at 1404). And, relying on our unpublished decision in *Biglow*, Mr. Ellis highlights that a panel of our court has "specifically rejected" this "shortcut[]" in the relevant conduct analysis. *See id.* at 22 (citing *Biglow*, 635 F. App'x at 401).

Mr. Ellis's argument is not without legal foundation: a sentencing court "must make particularized findings about the scope of a defendant's jointly undertaken criminal activity to determine the correct amount of drugs attributable to him." *Figueroa-Labrada*, 720 F.3d at 1266 (citing *Green*, 175 F.3d at 837); *see also Melton*, 131 F.3d at 1404 ("Proper attribution at sentencing requires the district court to analyze, and make 'particularized findings' about, the scope of the specific agreement the individual defendant joined in relation to the conspiracy as a whole." (quoting *Thomas*, 114 F.3d at 255)). And this judicial obligation stems naturally from the established proposition that "the scope of the 'jointly undertaken criminal activity' is not necessarily the same as the scope of the entire conspiracy." U.S.S.G. § 1B1.3 cmt. 3(B).

Consequently, insofar as the district court's statement that Mr. Ellis identifies could be construed as demonstrating that the court categorically equated the scope of Mr. Ellis's jointly undertaken criminal activity with Mr. Tatum, to

32

the scope of the overall conspiracy in which he and Mr. Tatum were participants, we would be constrained to conclude that the court committed legal error. That is, we would be obliged to conclude that the court committed legal error by not making particularized findings concerning the scope of the jointly undertaken criminal activity that Mr. Ellis agreed to participate in with Mr. Tatum—i.e., it erred by doing no more than simply finding that they were involved in the same conspiracy. *See, e.g.*, *Willis*, 476 F.3d at 1130 (determining that there was reversible error where "the District Court failed to make particularized findings about the scope of the criminal activity to which [the defendant] agreed"; instead, the court referred summarily and enigmatically to the evidence that it heard at trial and made comments that were *not* consistent with holding the defendant responsible for a "portion of the crime"); *Green*, 175 F.3d at 837 (concluding that the court committed reversible legal error by failing to "make particularized findings which are supported in the record about the scope of [the defendant's] agreement" to participate in the charged conspiracy, and it was "not sufficient" for the court to find that the defendant was involved in a drug-trafficking conspiracy with his coconspirator to hold him responsible for the illegal drugs personally attributable to that coconspirator); *Melton*, 131 F.3d at 1404 ("The district court failed to make such 'particularized findings' and misapplied the sentencing guidelines by improperly assuming that the scope of the criminal

33

activity [the defendant] agreed to jointly undertake was the same as the scope of the entire conspiracy, including the reverse sting.").

Here, the district court's findings were not entirely devoid of particularity. For example, the court did refer to the "drug deals" that the two men engaged in and their "maintaining a drug house in furtherance of that drug criminal activity." R., Vol. III, at 103. However, we acknowledge that, if read in isolation, the district court's statement that Mr. Ellis identifies plausibly could be read as indicating that the court impermissibly equated the scope of the overall conspiracy that Mr. Ellis and Mr. Tatum were criminally charged with participating in with the scope of the jointly undertaken criminal activity that Mr. Ellis agreed to participate in with Mr. Tatum. However, as we typically do in considering possible sentencing error, we do not read particular statements of the district court in isolation; rather, we must interpret their import in the context of the whole record. *Cf. United States v. Lente*, 759 F.3d 1149, 1174 (10th Cir. 2014) (considering "the entire record" in discerning whether the district court committed sentencing error)*; United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1221 (10th Cir. 2008) (same). In so doing, we reject Mr. Ellis's first challenge.

Specifically, in viewing the entire record, we conclude that the district court adopted the RPSR's findings concerning the scope of Mr. Ellis's jointly

34

undertaken criminal activity with Mr. Tatum, and those findings—as to particularity—convincingly pass legal muster. *See Figueroa-Labrada*, 720 F.3d at 1267 ("[T]he district court must make particularized findings (or adopt particularized findings made in the [presentence report]) on both jointly undertaken criminal activity and reasonable foreseeability before attributing the actions of coconspirators to a defendant as relevant conduct."); *cf. United States v. Godinez-Perez*, 864 F.3d 1060, 1063–64 (10th Cir. 2016) (elaborating on how the court's adoption of the presentence report's factual findings could not cure its error in failing to make findings concerning the scope of jointly undertaken criminal activity because the presentence report itself also did not include findings as to such scope); *Sells I*, 477 F.3d at 1242 (like *Godinez-Perez*, concluding that the district court erred because, "[a]lthough the district court adopted the findings contained in the [presentence report], the [report] did not make particularized determinations with respect to [the scope of the criminal activity]").

We start by explaining the basis for our conclusion as to the court's adoption of the RPSR's findings. Recall that, at the resentencing hearing, the district court properly heard the parties' arguments, which directed the court to key portions of the trial evidence bearing on the drug quantity computations and, more specifically, the related question of the scope of jointly undertaken criminal

35

activity. Then, the court effectively determined that the government's marshaling of evidence provided adequate proof of the RPSR's findings regarding the applicable drug quantity, and (with an exception not relevant here) the court expressly used the RPSR's recommended drug quantity as the "starting point for" its sentencing analysis. R., Vol. III, at 113.

The RPSR's recommended drug quantity of course was, in significant part, directly predicated on its findings concerning the scope of Mr. Ellis's jointly undertaken criminal activity with Mr. Tatum. *Id.*, Vol. IV, ¶ 109, at 49 (Mr. "Ellis is responsible for cocaine attributed to [Mr.] Tatum for the approximate 6 month period in which [Mr.] Ellis was deemed to be involved with [Mr.] Tatum's drug trafficking activities (ending in mid-April 2012)."); *see id.*, ¶¶ 107–08 (discussing "the jointly undertaken criminal activity that included purchasing cocaine from Djuane Sykes and selling crack cocaine at various locations together in the community and from 921 Haskell Street" and noting that Mr. "Ellis is assessed cocaine base" based on those purchases). Consequently, based just on our consideration of the sentencing transcript, alone, we might reasonably conclude that—when the court explicitly relied on the RPSR's drug quantity recommendation (i.e., adopting it)—it likewise effectively adopted the RPSR's findings concerning the scope of Mr. Ellis's jointly undertaken criminal activity with Mr. Tatum. That is so because the RPSR's scope findings served as an

36

essential predicate for its drug quantity recommendation, which the court endorsed.

However, we need not rely on the sentencing transcript alone. This is true because the court subsequently made its intentions explicit and crystal clear concerning its adoption of the RPSR's findings—including its findings regarding the scope of jointly undertaken criminal activity. Specifically, with the exception of the previously mentioned slight adjustment in drug quantity which is not at issue here, the court expressly stated, in its Amended Statement of Reasons, that it "adopts the presentence investigation report [i.e., the RPSR]." R., Vol. IV, at 256. Surveying the entire record, including this statement, we therefore have no difficulty concluding that the district court adopted the RPSR's findings concerning the scope of Mr. Ellis's jointly undertaken criminal activity with Mr. Tatum.

Unlike Mr. Ellis, we do not believe that this conclusion is forestalled by the fact that the district court did not orally state in explicit terms at the resentencing hearing that it adopted the RPSR's findings—as the court most notably did in *Figueroa-Labrada*, 720 F.3d at 1263 (describing and quoting the district court's explicit adoption). *See* Aplt.'s Reply Br. at 9 (citing *Figueroa-Labrada*, and stating: "The government claims this error is remedied because the district court adopted the findings of fact in the [R]PSR. Unlike the judges in the cases cited

by the government, however, the district court in this case never *expressly adopted* the report's factual findings." (emphasis added)).  Mr. Ellis does not cite any controlling authority that would have required the district court to make such an explicit oral statement of adoption in order to accomplish that result.

As we analyze the situation, the best that the court's lack of an explicit oral statement at the sentencing hearing that adopted the RPSR's findings possibly could do for Mr. Ellis is render the court's intentions on this matter ambiguous.  Though we do not opine that this is so, even if it were, the court's subsequent explicit written statement in its Amended Statement of Reasons certainly would negate any such ambiguity, making clear the court's intention to adopt the RPSR's findings—including its findings concerning the scope of jointly undertaken criminal activity.  *See United States v. Pankow*, 884 F.3d 785, 791 (7th Cir. 2018) ("In addition to the court's remarks at sentencing, we also look to the written statement of reasons to evaluate the sufficiency of the sentencing rationale."); *cf. United States v. Ford*, 675 F. App'x 832, 835 (10th Cir. 2017) (unpublished) ("Because the oral explanation for the sentence is ambiguous, we look to the record, including the written statement of reasons, to discern the court's intent in imposing the sentence.  The statement of reasons resolves any ambiguity here: it makes clear that the court adopted the [presentence report] . . . ." (citation omitted)); *cf. also United States v. Schock*, 862 F.3d 563, 570 (6th

Cir. 2017) ("When the oral sentence is ambiguous, however, we look to the district court's written judgment, commitment order, and statement of reasons."); *United States v. Brown*, 808 F.3d 865, 871 (D.C. Cir. 2015) (ruling that, "[w]hile these statements [at the sentencing hearing] suggest some confusion on the part of the trial judge, the Statement of Reasons form clarifies his understanding").

Therefore, based on our consideration of the entire record, we conclude that the district court adopted, as its own, the RPSR's findings concerning Mr. Ellis's scope of jointly undertaken criminal activity with Mr. Tatum. *See, e.g.*, *Figueroa-Labrada*, 720 F.3d at 1266 (noting that, when the court adopts the presentence report, "we review the information in [that report] as if it were the findings of the district court"). And the RPSR made particularized findings concerning this matter, stating:

> Marvin Ellis and Ataven Tatum were involved in jointly undertaken criminal activity that included purchasing cocaine from Djuane Sykes and selling crack cocaine at various locations together in the community and from 921 Haskell Street. Their jointly undertaken criminal activity is also demonstrated by [Mr.] Tatum's phone being utilized to arrange a sale that was later consummated by Marvin Ellis, and Marvin Ellis accompanying and assisting [Mr.] Tatum with drug deals.

R., Vol. IV, ¶ 107, at 49.

More specifically, the RPSR found that there was evidence of both an explicit and implicit agreement between Mr. Ellis and Mr. Tatum regarding their use of the 921 Haskell residence for drug trafficking. The explicit agreement

39

assigned "[Mr.] Ellis[] responsibility for the utilities[,] and [Mr.] Tatum[] responsibility as the renter" of 921 Haskell.  *Id.*, ¶ 325, at 109.  Their implicit agreement was for them both to "cook crack cocaine" at the residence and to "sell crack cocaine from the residence."  *Id.*  The RPSR underscored that "[t]he jointly undertaken criminal activity is also demonstrated by [Mr. Ellis] and Theoplis Ellis picking up drugs that [Mr.] Tatum had ordered, and [the] occasional use of a common phone associated with arranging drug transactions."  *Id.*

We conclude that it is beyond peradventure that the RPSR's findings are sufficiently particularized regarding the scope of Mr. Ellis's jointly undertaken criminal activity involving Mr. Tatum.  Unlike in *Godinez-Perez*, for example, the RPSR's findings have the effect of "specifically linking" Mr. Ellis's drug trafficking activities with similar activities that the investigation traced to Mr. Tatum.  864 F.3d at 1063.  And those findings of the RPSR—and, consequently, of the district court itself—do not make the mistake that we identified in *Melton* of "improperly assuming that the scope of the criminal activity [Mr. Ellis] agreed to jointly undertake was the same as the scope of the entire conspiracy."  131 F.3d at 1404.  Nor do the RPSR's findings provide only "bare-bones information" linking the drug distribution activities of Mr. Ellis and Mr. Tatum.  *United States v. Flores-Alvarado*, 779 F.3d 250, 257 (4th Cir. 2015).

Consequently, where the presentence report has made legally sufficient particularized findings regarding jointly undertaken criminal activity, as here, and the district court has adopted those findings as its own, it cannot be said that the court erred by failing to make particularized findings regarding the scope of the defendant's jointly undertaken criminal activity. *See, e.g.*, *Figueroa-Labrada*, 720 F.3d at 1267. Accordingly, Mr. Ellis's first challenge fails.

## C

Regarding his second challenge, Mr. Ellis contends that the record does not support the district court's finding regarding the scope of his jointly undertaken criminal activity with Mr. Tatum. According to Mr. Ellis, the "evidence does not prove that [Mr.] Tatum and [Mr. Ellis] agreed to work toward a mutual goal with respect to the cocaine [Mr.] Tatum purchased from [Mr.] Sykes." Aplt.'s Opening Br. at 25. Instead, Mr. Ellis argues that he and Mr. Tatum were "engaged in separate, rival business operations," and they were actually "competitors." *Id.* In this same vein, citing the illustration found in Guidelines § 1B1.3 cmt. (4)(C)(vi), Mr. Ellis contends that the record reveals "critical evidence that the men functioned as independent dealers with a common source of supply"—namely, Mr. Sykes—and that such evidence does not legally support a finding of jointly undertaken criminal activity. *Id.* at 28.

41

However, Mr. Ellis's arguments are unpersuasive. There was ample record evidence to support the district court's finding concerning the scope of jointly undertaken criminal activity between Mr. Ellis and Mr. Tatum. Even if that were not so, we certainly could not conclude that the district court's finding on this point is not plausible in light of the record evidence. Accordingly, in all events, the court's finding survives scrutiny and is not reversible, given our deferential clear-error standard. *See, e.g.*, *Piper*, 839 F.3d at 1271 (noting that "[i]f the 'court's account of the evidence is plausible in light of the record viewed in its entirety,' we may not reverse it even if we might have weighed the evidence differently" (quoting *Anderson*, 470 U.S. at 574)); *Torres*, 53 F.3d at 1144 (stating that, "[t]o constitute clear error, we must be convinced that the sentencing court's finding is simply not plausible or permissible in light of the entire record on appeal").

We begin with a brief overview of the legal backdrop against which the district court made its finding. In particular, the Guidelines commentators provide helpful benchmarks to courts in applying the "jointly undertaken criminal activity" requirement, including the following:

> [T]he court *may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others*. Accordingly, the accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, *even*

42

> *if those acts were known* or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B).

U.S.S.G. § 1B1.3 cmt. 3(B) (emphases added).

In particular, the Guidelines commentators offer illustrations to clarify the factual circumstances under which the requirement is satisfied, including the illustration found in comment (4)(C)(vi)—which Mr. Ellis looks to for support:

> Defendant P is a street-level drug dealer who knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a jointly undertaken criminal activity with them. In contrast, Defendant Q, another street-level drug dealer, *pools his resources* and profits with four other street-level drug dealers. Defendant Q is engaged in a jointly undertaken criminal activity and, therefore, he is accountable under subsection (a)(1)(B) for the quantities of drugs sold by the four other dealers during the course of his joint undertaking with them because those sales were within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable in connection with that criminal activity.

*Id.* cmt. 4(C)(vi) (emphasis added).

With this legal backdrop in mind, the record provided ample evidence for the district court's finding that Mr. Ellis and Mr. Tatum were jointly engaged in criminal activity—encompassing the purchase of cocaine and the sale of crack—during the critical six-month period that Mr. Tatum was buying cocaine

43

from Mr. Sykes.  Perhaps the most obvious indicator during this period of such jointly undertaken criminal activity relates to the 921 Haskell residence.

The two men shared the 921 Haskell residence and used it to distribute cocaine base and other illegal narcotics.  Mr. Ellis and Mr. Tatum not only were aware of each other's drug-trafficking activities at this residence, but they also pooled their resources in a number of respects that had the obvious effect of facilitating their trafficking activities.  With Mr. Tatum's financial assistance, Mr. Ellis had leased the 921 Haskell residence.  Subsequently, Mr. Tatum later signed a contract for deed to buy it, agreeing to make payments to the current owner.  And, because all of the utilities—including the electricity—were in Mr. Ellis's name, he literally was responsible for keeping the lights on for the men's drug-trafficking operation.  Mr. Ellis and Mr. Tatum also would share the phone belonging to Mr. Tatum to communicate with customers regarding drug sales.

Furthermore, both men used the services of Theoplis in carrying out their drug-trafficking activities at 921 Haskell; among other services, Theoplis "functioned as a doorman."  R., Vol. IV, ¶ 78, at 43.  Theoplis was compensated for his services daily, and the district court could have reasonably inferred that—since he worked for both Mr. Ellis and Mr. Tatum—they shared the costs of his services in some manner.

In light of the foregoing evidence, the district court easily could find—within the mold of the Guidelines commentary—that Mr. Ellis and Mr. Tatum had an "implicit agreement" during the relevant six-month period, reflecting the scope of their jointly undertaken criminal activity, to "cook crack cocaine" at 921 Haskell and to "sell crack cocaine from the residence." *Id.*, ¶ 325, at 109; *see also* U.S.S.G. § 1B1.3 cmt. 3(B).

Furthermore, far from helping him, the illustration that Mr. Ellis highlights in the Guidelines commentary—specifically, in comment 4(C)(vi)—lends powerful support to the district court's scope finding. In that illustration, Mr. Ellis is much more akin to Defendant Q—whom the Guidelines commentators would hold "accountable . . . for the quantities of drugs sold by . . . other dealers during the course of his joint undertaking," than he is to Defendant P, who would escape this sort of attribution. U.S.S.G. § 1B1.3 cmt. 4(C)(vi).

More specifically, Mr. Ellis's connection to Mr. Tatum was not limited to simply knowing that they "share[d] a common source of supply" and sold "the same type of drug," like Defendant P. *Id.* Rather, Mr. Ellis "pool[ed]" his resources with Mr. Tatum—which (among other things) allowed the two men to have a roof over their heads at 921 Haskell to sell drugs and the wherewithal to keep Theoplis working for their mutual benefit—making Mr. Ellis's position much more akin to Defendant Q. *Id.*

45

Accordingly, it would be quite plausible—indeed, eminently reasonable—for the district court to determine that these facts supported a finding that Mr. Ellis was engaged in a jointly undertaken criminal activity with Mr. Tatum during the critical six-month period to purchase cocaine and distribute crack at 921 Haskell.  The upshot being that Mr. Ellis should be held "accountable" for the cocaine powder that Mr. Tatum purchased from Mr. Sykes during this period.

In retort, Mr. Ellis asserts that "nothing about the Haskell house specifically pertains to the cocaine [Mr.] Tatum purchased from [Mr.] Sykes over the six-month period between October 2011 and April 2012."  Aplt.'s Opening Br. at 25.  However, the district court could plausibly, as well as reasonably, find to the contrary.  Mr. Tatum undisputedly distributed crack (i.e., cocaine base) from the 921 Haskell residence during this six-month period.  And it is elementary that crack is made from cocaine powder—the substance Mr. Tatum purchased from Mr. Sykes during the same six-month period.  Therefore, the district court could plausibly infer—with no contrary evidence apparent in the record—that at least *some* of the crack that Mr. Tatum trafficked at 921 Haskell was made with the cocaine that he purchased from Mr. Sykes.  Furthermore, and perhaps more importantly, the district court's finding regarding Mr. Ellis's jointly undertaken

46

criminal activity with Mr. Tatum during this six-month period did not depend solely on two men's activities at 921 Haskell.

Recall that the evidence showed that, during this period, on between ten to fifteen occasions, Mr. Ellis and Mr. Tatum traveled together to pick up powder cocaine from Mr. Sykes. And, as with their activities at 921 Haskell, both men plausibly could be found to have pooled their resources by employing Theoplis for their mutual benefit. Specifically, Theoplis assisted both men by, among other things, picking up and delivering drugs in settings other than 921 Haskell. Moreover, on at least one occasion, Mr. Ellis and Theoplis picked up cocaine on behalf of Mr. Tatum from Mr. Sykes. These activities evidenced a good deal of cooperation and coordination, which significantly fortified the foundation of the district court's (adopted) finding that Mr. Tatum "worked in concert with Marvin Ellis and Theoplis Ellis, who would all work together to sell 'crack' cocaine to various street level customers." *See* R., Vol. IV, ¶ 75, at 42–43.

And, if these acts were not enough, the evidence showed that in early 2012, primarily in the months of February and March, the DEA conducted a series of controlled buys of crack cocaine, through the use of CIs, from Mr. Ellis and Mr. Tatum in locations outside of 921 Haskell. Notably, on three occasions, Mr. Ellis and Mr. Tatum were together when the drug transactions took place, and they shared the resource of Mr. Tatum's vehicle in conducting two of these

47

transactions.  Indeed, in one of the drug deals, Mr. Ellis effectively acted as the go-between—shuttling between the CI's vehicle and Mr. Tatum's: Mr. Ellis entered the CI's vehicle and obtained the money; took the money and delivered it to Mr. Tatum, whereupon he received the crack; and then he returned with the crack and handed it to the CI through the vehicle's window.  Significantly, even in a street sale that Mr. Ellis conducted on his own, he highlighted his joint venture with Mr. Tatum, when he "bragged about obtaining his crack cocaine from 'Tater'"—Mr. Tatum's nickname.  *Id.*, ¶ 83, at 44.

Consequently, there was ample evidence relating to the two men's drug-trafficking activities—*both* at and away from 921 Haskell—upon which the district court could have plausibly found that Mr. Ellis was engaged in jointly undertaken criminal activity with Mr. Tatum during the relevant six-month period to purchase powder cocaine and distribute crack.[9]

---

[9] During the sentencing hearing and on appeal, Mr. Ellis's counsel argued that it does not naturally follow from Mr. Ellis and Mr. Tatum's shared residence and drug-trafficking activities at 921 Haskell that the two men were engaged in a joint venture—reasoning that they just as well could have been acting independently of each other.  In this regard, Mr. Ellis's counsel has analogized the relationship between the two men to two lawyers that have an office-sharing arrangement, but nevertheless maintain separate and independent practices.  In counsel's hypothetical, the two lawyers "may have a common reception, they may split the bills,"—but at the end of the day, if one of the lawyers commits fraud, or does something that is not the other lawyer's "stuff," then the other lawyer should not be held accountable for that conduct.  R., Vol. III, at 63–64.  However, in making its finding of jointly undertaken criminal

(continued...)

To be sure, Mr. Ellis seeks to advance a contrary view of the evidence—under which Mr. Ellis and Mr. Tatum operated independently in their drug-trafficking activities and actually "were competitors." Aplt.'s Opening Br. at 25. For example, Mr. Ellis attempts to undercut the notion that his ten to fifteen trips with Mr. Tatum to purchase cocaine from Mr. Sykes bespeak jointly undertaken criminal activity by arguing that the two men made separate cocaine purchases from Mr. Sykes on these trips. *See id.* at 5 ("[A]lthough [Mr.] Tatum and [Mr. Ellis] continued to arrive . . . together, they would make separate

---

[9](...continued)
activity, the district court effectively rejected this analogy. And, on this record, we think that the court had a more than plausible basis for doing so. There is no suggestion in Mr. Ellis's hypothetical that the two lawyers repeatedly assisted and coordinated with each other in their practices by, for example, repeatedly litigating cases together. Yet, the hallmark of the relationship of Mr. Ellis and Mr. Tatum was coordination and cooperation. In particular, Mr. Ellis repeatedly assisted Mr. Tatum with crack sales in the community. And, as we discuss *infra*, the two men plausibly could be found to have repeatedly provided mutual aid and protection to each other in traveling on ten to fifteen occasions together to purchase powder cocaine from Mr. Sykes. Furthermore, the reported reason that Mr. Ellis had a falling out with Mr. Tatum is that the latter was attempting to boss him around—a circumstance that one typically would not expect to find between two lawyers operating independent legal practices, but one that you might find, if the two lawyers were partners. All that said, even if Mr. Ellis's lawyer hypothetical could be viewed as reflecting a plausible reading of the record—*viz.*, one indicating that Mr. Ellis and Mr. Tatum were "sometimes friendly" drug dealers sharing a residence at 921 Haskell, but nevertheless "engaged in separate, rival business operations," Aplt.'s Opening Br. at 25—the district court's contrary reading of the record constituted, at the very least, a plausible alternative. Under the deferential clear-error standard, that is enough to render this hypothetical unavailing. *See, e.g.*, *Torres*, 53 F.3d at 1144.

purchases from [Mr.] Sykes. . . ."); *id.* at 28 (noting the fact that Mr. Ellis and Mr. Tatum "made *separate purchases* of powder cocaine from [Mr.] Sykes *at the same time* is a critical fact the government has never dealt with"). However, even if that were true, it would not render implausible—or even unreasonable—the district court's finding that Mr. Ellis and Mr. Tatum—along with Theoplis—"would all work together to sell 'crack' cocaine to various street level customers," R., Vol. IV, ¶ 75, at 43, and, more specifically, that the two men "were involved in jointly undertaken criminal activity that included purchasing cocaine from Djuane Sykes and selling crack cocaine at various locations together in the community and from 921 Haskell Street," *id.*, ¶ 107, at 49.

Indeed, congruent with Guidelines commentary—the district court would not have been unreasonable in finding support for its jointly undertaken criminal activity finding in the fact itself that the two men elected to "coordinate their . . . efforts" and, specifically, chose to travel together to make the cocaine purchases. *See* U.S.S.G. § 1B1.3 cmt. 4(C)(viii). From their coordination of their travel to Mr. Sykes, Mr. Ellis and Mr. Tatum plausibly could be deemed to have gained "mutual assistance and protection"—even if they ultimately made separate purchases from him. *See id.* (noting that individuals hired separately to smuggle marijuana "across the border from Mexico into the United States" could be deemed to have engaged in jointly undertaken criminal activity, where they

50

"receive[d] their individual shipments from the supplier at the same time and coordinate[d] their importation efforts by walking across the border together for mutual assistance and protection"). As such, their coordinated conduct would support a plausible finding that they each should be held "accountable for the aggregate quantity" of cocaine that they purchased to further their crack distribution activities. *Id.*

And lastly, in support of his contrary view of the evidence, Mr. Ellis points to the one transaction during the latter part of the six-month period in which Mr. Ellis arguably behaved more like a competitor than a collaborator with Mr. Tatum. Recall that in that incident, Mr. Ellis reportedly "told the [CI] to 'not mess' with [Mr.] Tatum anymore and to only contact him for drugs." R., Vol. IV, ¶ 300, at 103. However, the existence of this single incident—which took place about one month before Mr. Ellis parted company with Mr. Tatum—is hardly inconsistent with the district court's overall finding that Mr. Ellis and Mr. Tatum, during the six months at issue, banded "together to sell 'crack' cocaine to various street level customers." *Id.*, ¶ 75, at 43. Indeed, the incident does not even show that Mr. Ellis engaged in a side deal that was inconsistent with his jointly undertaken criminal activity with Mr. Tatum—only that he contemplated doing so in the future. *Cf. United States v. Childress*, 58 F.3d 693, 711 n.3 (D.C. Cir. 1995) ("[T]he fact that certain conspirators engage in independent drug

transactions does not on its own negate the existence of a single conspiracy. Though genuine side deals would not be attributable to the conspiracy charged in this case, neither would their existence prevent the jury from concluding that a core, single conspiracy was also in operation simultaneously." (citation omitted)). At bottom, this one incident does not render implausible—or even unreasonable—the court's ultimate finding that Mr. Ellis was engaged in jointly undertaken criminal activity with Mr. Tatum during the relevant six-month period.

Therefore, for the foregoing reasons, we also reject Mr. Ellis's second challenge. There was ample record evidence to support the district court's finding that, during the six-month period from mid-October 2011 to mid-April 2012, Mr. Ellis and Mr. Tatum were engaged in a jointly undertaken criminal activity to purchase powder cocaine and distribute crack (i.e., cocaine base). And, even if that were not so, under the deferential clear-error standard of review, we certainly could not conclude on this record that the court's finding in this respect was implausible, and therefore the finding should be upheld.

**IV**

For these reasons, we **AFFIRM** the district court's sentencing judgment.